ROSENBAUM *v.* STATE.

Opinion delivered December 10, 1917.

1. EVIDENCE—OPINION OF WITNESSES—NON-EXPERT TESTIMONY—EXPEDIENCY OF ACTS IN VIOLATION OF THE LAW.—The opinion of a witness, not founded on science or in relation to any special business, art or trade requiring peculiar knowledge, but given purely as the witness' theory concerning an issue of morals or duty, is inadmissible, whether such opinion be by a professional or nonprofessional witness.

2. EVIDENCE—OPINION OF NON-EXPERT WITNESS.—The opinion of an ordinary witness on a question of law or on a question which is for the jury to decide on the facts, is inadmissible. Opinions or conclusions are inadmissible on issues which the tribunal alone must determine.

3.   EVIDENCE—VIOLATION OF SABBATH LAW—OPINION EVIDENCE AS TO
     EXPEDIENCY.—Appellant was indicted for the violation of Kir-
     by's Digest, § 2030, prohibiting persons from laboring on Sunday,
     by conducting and operating a moving picture show in Argenta,
     Ark.   *Held,* opinion evidence of witnesses that they regarded
     moving pictures on Sunday as a necessity, in view of the large
     numbers of soldiers stationed at Fort Roots and at Camp Pike, is
     inadmissible.
4.   SABBATH BREAKING—OPERATION OF MOTION PICTURE SHOW.—The
     operation of a motion picture show on Sunday is a violation of
     Kirby's Digest, § 2030, which provides: "Every person who
     shall on the Sabbath, or Sunday, be found laboring, or shall
     compel his apprentice or servant to labor or to perform other
     services than customary household duties, of daily necessity,
     comfort or charity, on conviction thereof, shall be fined. * * *"

Appeal from Pulaski Circuit Court, First Division;
*Edward B. Downie,* Judge; affirmed.

*Hal. L. Norwood* and *Rhoton & Helm,* for appellant.

It was error to direct a verdict. The evidence es-
tablishes the moral fitness and the *necessity* of the labor,
and the issue should have been submitted to a jury. Kir-
by's Digest, § 2030; 61 Ark. 219-20; 85 *Id.* 135; 72 *Id.* 169;
55 *Id.* 10.

*John D. Arbuckle,* Attorney General, and *T. W.
Campbell,* Assistant, for appellee.

1.   The operation of the show was not a "necessity"
within the meaning of the statute. The witnesses merely
gave their opinions. 125 Ark. 159; 61 *Id.* 216; 20 *Id.* 290;
55 *Id.* 10; 80 Conn. 582.   See also 37 Cyc. 548; 144 Mass.
363; *Ib.* 28.

2.   A verdict was properly directed.   84 Ark. 564;
88 *Id.* 269.

STATEMENT OF FACTS.

Section 2030 of Kirby's Digest reads as follows:
"Every person who shall on the Sabbath or Sunday,
be found laboring, or shall compel his apprentice or ser-
vant to labor or to perform other services than custo-
mary household duties, of daily necessity, comfort or

charity, on conviction thereof, shall be fined one dollar for each separate offense.''

Louis Rosenbaum was convicted of violating this statute. The proof on the part of the State consisted in an admission by the defendant that he had operated a moving picture show in the City of Argenta, Pulaski County, Arkansas, on Sunday, July, 29, 1917; that he charged for admission to the show; that he operated a moving picture show in the afternoon of that day, and worked employees in connection with his business. He testified that his show was clean and educational in character.

Several witnesses testified. on behalf of the defendant. Some of these witnesses were officers of high rank and prominent in army circles at Camp Pike; others were prominent in the social and business activities of the cities of Argenta and Little Rock. One of the appellant's witnesses was D. M. Pixley, mayor of Argenta. He testified that at the time the defendant operated his moving picture show there were between four and five thousand soldiers at Fort Logan H. Roots, and taking into consideration the unusual conditions that exist over there he was of the opinion that clean moving picture shows were a necessity for the soldiers.

One of the defendant's witnesses, W. B. Smith, who was president of the Chamber of Commerce of Little Rock, and as such took a most conspicuous and commendable part in the location of the cantonment in proximity to these cities, had given the matter of camp activities and other matters connected with it considerable thought and time. His testimony fairly illustrates the character of the testimony given by each of the witnesses who testified on behalf of the appellant. He testified in part as follows:

Q. ''Taking into consideration the number of soldiers camped at Fort Roots on the 29th of July—approximately 4,000 men—and conditions as they existed with that number of men camped there and the hours for

getting off to come to town—state whether or not the operation of clean and wholesome picture shows on Sunday was a necessity?" A. "I think so."

He was then asked to state why, and answered: "The soldiers have their entire Sunday off, except those who are on some particular duty; their mornings are devoted, or should be devoted to religious services. The afternoon is on their hands; they are away from their homes; they are largely in strange communities; and in my mind and opinion it is to the interest of the soldiers that they should have clean and wholesome diversion for the Sunday afternoon. I am clear in my opinion that the picture shows, such as we have in Little Rock and Argenta, and Sunday baseball, one of the clean sports of the country, would be beneficial to the physical and moral life on their recreation day."

On cross-examination he stated: "I am not in favor of violating a statute law, but common practice in the community justifies the exception to the law as we have it practiced in our community on many things that are considered necessities on Sunday. Personally, I care nothing for Sunday baseball and do not favor it except under the conditions I have mentioned, and I would not advocate the violation of the statute on it. I like picture shows as well as drama. I consider them of high educational value."

He was asked if he based his opinion of the necessity of moving picture shows here on Sunday on the fact of the unusual situation of having so many soldiers in close proximity to the town, and answered: "I do not consider it a necessity under normal conditions in the city; base it entirely upon the ground as stated, that we have a large number of men here in July and now, and a large number of men detached with no home life and none of the soft and loving influence of home life that would take them there for their rest and diversion. You can not expect the men to give attention to the spiritual life the entire Sunday. Get him to devote some hours

in the morning to religious and spiritual matters and you have accomplished all that is possible with the average man. I base it on the large number of men detached. If we had 8,000 or 9,000 laborers imported here I would say that the conditions were just as urgent as for the soldiers."

It was shown by Colonel James, of the 153d Infantry (formerly First Arkansas) that the soldiers underwent strenuous training, requiring the physical movements of their entire bodies. The hours of training were from half past seven in the morning until half past three in the afternoon with an hour at noon for luncheon. One-fifth of the men had permission to visit the cities of Argenta and Little Rock each night, and on Sunday they all had that permission except those who were on guard duty. Sunday was the recreation day for all the men.

It was shown that before the night of the moving picture show the defendant gave out a lot of passes; he had some three hundred passes distributed. He was not selling tickets on the night of July 29; just took the money if they offered it and let them pass in. It was further shown that there were seventy soldiers in attendance upon the picture show on the occasion mentioned. It was contemplated that there would be between 25,000 and 40,000 soldiers located at Camp Pike.

Eliminating that testimony of the witnesses which was but the expression of their opinions, the undisputed facts are that the defendant and his employees operated a moving picture show in the City of Argenta, Pulaski County, Arkansas, on Sunday, July 29, 1917; that at Fort Logan H. Roots at that time there were approximately 4,000 men who were detached from their homes and who daily were put through the strenuous exercise of body and mind that was incident to their training. There were to be stationed at Camp Pike between 25,000 and 40,000 soldiers, one-fifth of whom were permitted each night to visit the cities of Little Rock and Argenta, except on Sunday, when all were given this permission

except those on special guard and other duties at the camp. Sunday was their general recreation day. There were at that time at Camp Pike about 8,000 working men, engaged in the construction of the buildings of the cantonment, who did not have an opportunity to go to moving picture shows except on Sunday.

The State objected to the opinion evidence of the witnesses on behalf of defendant, which objection the court overruled, to which the State duly excepted. The court instructed the jury to find the defendant guilty, to which the defendant excepted. The jury returned a verdict of guilty, and the court entered a judgment fixing defendant's punishment at a fine of one dollar and costs, from which judgment this appeal has been duly prosecuted.

WOOD, J., (after stating the facts). The court, upon the objection of the State to the opinion evidence of the witnesses, should have excluded such testimony from the jury. But the ruling of the court directing the jury to return a verdict of guilty, notwithstanding the opinion of these witnesses, was, in legal effect, tantamount to excluding such evidence. This ruling of the court was correct.

The witnesses who testified on behalf of the appellant were unanimous in the opinion that the operation of clean, wholesome and moral picture shows in the cities of Little Rock and Argenta, under the conditions above stated, was a necessity for the physical comfort and moral well being of the soldiers who were located at Fort Logan H. Roots and Camp Pike.

Considering the general intelligence and high standing of these witnesses, their opinions would be entitled to great respect and might have a cogent influence in any subject-matter of controversy where it was competent and proper to take into consideration such opinions in determining the issue involved. These opinions, and especially the arguments to sustain them, might be addressed with perfect propriety to the legislative depart-

ment of the government, whose province it is to enact laws, but they certainly have no place before the courts, which have no power to legislate and whose exclusive and only province is to interpret the laws as they have been enacted by the Legislature.

(1-3) It is a familiar rule, without exception, that the opinion of a witness not founded on science or in relation to any special business, art or trade requiring peculiar knowledge, but given purely as the witness' theory concerning an issue of morals or duty, is inadmissible, whether such opinion be by a professional or non-professional witness. See Rogers' Expert Testimony, p. 32, Sec. 11. It is also a well established rule of evidence that the opinion of an ordinary witness on a question of law or on a question which it is for the jury to decide on the facts, is inadmissible. Opinions or conclusions are inadmissible on issues which the tribunal alone must determine. Lawson on Expert and Opinion Evidence, p. 557.

Here the issue is not what the law might or should be, but the issue is, did the appellant violate the law as it is? The appellant testified that he was operating a moving picture show that was clean and educational in character, without giving the facts upon which he based such conclusion. This bald expression of opinion on his part, and likewise the expressions of the earnest conviction of the witnesses testifying in his behalf that the operation of such a show was necessary for the soldiers, were a patent usurpation of the functions of the court and jury, and, under the above rule, were wholly incompetent.

Some of the witnesses, in advocacy of the moving picture show for the benefit of the soldiers at Camp Pike, declared with perfervid enthusiasm that although under normal conditions such shows might not be necessary, yet in view of the exigencies now existing on account of the location of so many soldiers at Camp Pike, the term "necessity" as used in the statute should be so con-

strued as to meet the present conditions. Of course, such opinions are not evidence. They relate to the policy of the law, with which the courts have naught to do. They ignore the fact that the statute under consideration is a general one, with no exceptions in favor of those who may operate moving picture shows in the cities of Argenta and Little Rock because of conditions existing in those cities. Moreover, all such views evince either a total misconception or superficial knowledge of the statute, or else but slight regard for laws intended to protect and preserve for the civilization of mankind one of the most cherished and venerable institutions of the Christian world.

Those who believe in God and accept the Bible as the revelation of His will, look upon the Sabbath as of divine origin. They believe that the creator himself established it by the fourth commandment in commemoration of that period in the cycle of creation designated by him as the "seventh day," when he ended the work he had made, and blessed and sanctified that day as a day of rest. Gen. 2:2; Ex. 20: 8-11.

"The scope and meaning of the Sabbath day"— the seventh day of the Hebrew week—"was very much extended and amplified by the provisions of the laws of Moses." The Americana, Vol. 18, *verbum* "Sabbath."

When Jesus came he found that a certain religious sect among the Jews were so fanatical, in the observance of these laws, and were adhering so closely to the very letter of the fourth commandment that they considered it a violation of the same for one to be engaged in any work of necessity or charity. For instance, the Pharisees construed the fourth commandment to prohibit the healing of a sick man, the plucking of ears of corn to feed the hungry; no Jew might kindle a fire; the healed patient could not bear his own bed; broken bones could not be set, nor poulticed or bound up on the Sabbath day. These religious zealots dogged the footsteps of Jesus in order that they might accuse him of violating the fourth com-

mandment as they construed it.  At length, with anger, he turned upon them, and, in a scathing rebuke, admonished them that they were in the presence of one who was Lord of the Sabbath day, greater than the temple and the ceremonies connected with its service, and he proceeded to teach them that it is lawful to do good on the Sabbath, that the Sabbath was "made for man and not man for the Sabbath," and by both precept and example illustrated that any labors incident to works of necessity, comfort or charity were not prohibited by the law of the Sabbath as contained in the fourth commandment, and that in construing it otherwise they had wholly misapprehended its divine purpose.  Matthew 12:1-14; Mark 2:23-28; Mark 3:1-6.  The Americana, *supra.*

Those who accept the authenticity of the scriptures as contained both in the Old and the New Testament believe that Jesus was the Son of God, as well as the Son of Man; that he was made flesh and dwelt among us; that he was in the beginning with God; that he was a divine teacher, and hence could teach as one having all authority and not as the scribes; that he arose from the dead on Sunday, the first day of the week under the Julian calendar.  John 1:1-14; Luke 24:1.  Those who do not accept the biblical account of the divine origin of the Sabbath must, nevertheless, yield to the voice of tradition and secular history which abundantly establish the fact that at the time of the coming of Christ there existed an institution of religion which had its origin sometime in the dim and remote past, which was called the Sabbath and which was then being observed by the Jewish people on the seventh day of the week of the Hebrew calendar in commemoration of the day on which it was believed by them that God, having finished the work of creation, rested from his labors and consecrated the day as one of rest and worship.  And those who do not believe in the biblical account of the divinity of Jesus and of the manner of his death and resurrection must concede that profane history indisputably establishes the fact that a man

called Jesus lived; that he was at least a great moral
philosopher and teacher; that he established his church,
and that his disciples were called Christians; that his life
and teachings had such a wonderful influence upon his
followers that in commemoration of what they believed
to be the day of his resurrection from the dead they set
apart Sunday, the first day of the week, to be observed
as a perpetual memorial of that event. It was to be ob-
served in precisely the same manner that Jesus had
taught for the observance of the Hebrew Sabbath. Hence,
Sunday is now designated throughout all Christendom
as the Lord's day or Christian Sabbath. Therefore,
whether the Christian Sabbath be considered as a matter
of human or divine origin, we have it established as a
potent factor of history with a clear interpretation by
him in whose memory it was established as to how it
should be observed.

From the time of the inauguration of the Christian
Sabbath, which is almost coevil with the existence of
Christianity itself, it is easy to trace its history down to
the present day. For, although it began as a purely re-
ligious institution, it had had such a marvelous effect in
the betterment of the civil conduct and life of the nation
that in the early part of the fourth century the Christian
emperor Constantine issued a decree commanding all
the people of the city of Rome to rest and cease from
their ordinary avocations on that day, making an excep-
tion however in favor of those engaged in agricultural
pursuits, "who, on account of the bounty of heaven may
have lost the opportunity to reap or sow their grain on
another day." As showing some of the things that are
not in keeping with the observance of Sunday as it was
celebrated by the Christians in that early time, Theodo-
cius, in the latter part of the fourth century, issued a
decree suspending theatrical shows and circus races on
Sunday. "These historical facts," says the Americana,
"are important as bearing on the present Sunday laws
of England and America."

The Frank Emperors had Sunday observed; the Code of Napoleon ordered it, and the observance of the Lord's day has been enjoined by statutes in England from the earliest times. The Americana. Coming on down to the legislation in the mother country, which forms the basis of such legislation in practically all the states of the Union, we find that in the reign of Charles II an act, entitled, "An act for the better observation of the Lord's day, commonly called Sunday," was passed, which, among other things, provides: "That no trades-man, artificer, workman, laborer, or other person what-soever shall do or exercise any worldly labor, business or work of their ordinary callings upon the Lord's day, or any part thereof (works of necessity and charity only excepted)." Stat. at Large, 29 Chas. II, chap. 7, p. 412, (12 Char. 2, p. 412).

It will be observed that our statute is almost a literal copy of the act just quoted.

The history of the origin of the Sabbath and of the legislation which has been enacted to preserve and per-petuate Sunday or the Christian Sabbath as a civil insti-tution is a subject upon which volumes have been writ-ten, but the above brief resume sets forth the salient fea-tures that are indispensible for the correct interpreta-tion of the meaning of the words "necessity, comfort or charity" as used in the act under review.

Christ, in expounding what he and those of the Chris-tian faith believed to be the divine law as contained in the fourth commandment, did not specifically designate the labor which it was lawful to perform on the Sabbath day as works of necessity, comfort or charity. Yet a critical analysis of his examples and precepts illustrating the character of deeds that might lawfully be done on the Sabbath day demonstrates clearly that it was only such labor as might be properly classed as that of *daily necessity, comfort or charity.* The fact that such legis-lation is colored and molded by the teachings of One whom the great majority of people in this country and

other nations of Christendom worship as their Lord and Savior does not render such legislation unconstitutional, as has been often held. *Kreider* v. *State,* 103 Ark. 438; *Scales* v. *State,* 47 Ark. 476, and cases there cited.

The Supreme Court of New York, in *Lindenmuller* v. *The People,* 33 Barb. 548, 562, 564, speaking on this point, said: "Religious tolerance is entirely consistent with a recognized religion. * * * Compulsory worship of God in any form is prohibited, and every man's opinion on matters of religion, as in other matters, is beyond the reach of law. No man can be compelled to perform any act or omit any act as a duty to God; but this liberty of conscience in matter of faith and practice is entirely consistent with the existence, in fact, of the Christian religion, entitled to and enjoying the protection of the law as the religion of the people of the State, and as furnishing the best sanctions of moral and social obligations. The public peace and public welfare are greatly dependent upon the protection of the religion of the country, and the preventing or punishing of offenses against it, and acts wantonly committed subversive of it."

Our statute seeks to protect and preserve the observance of the Christian Sabbath as a civil institution. According to the testimony of some of the best writers and most profound thinkers of the world, legal, literary and ecclesiastical, it would appear that such legislation is fully justified. Blackstone says:

"For, besides the notorious indecency and scandal of permitting any secular business to be publicly transacted on that day, in a country professing Christianity, and the corruption of morals which usually follows its profanation, the keeping one day in the seven holy, as a time of relaxation and refreshment, as well as for public worship, is of admirable service to a State considered merely as a civil institution. It humanizes, by the help of conversation and society, the manners of the lower classes; which would otherwise degenerate into a sordid ferocity and savage selfishness of spirit; it enables the in-

dustrious workman to pursue his occupation in the ensuing week with health and cheerfulness; it imprints on the minds of the people their sense of their duty to God, so necessary to make them good citizens; but which yet would be worn out and defaced by an unremitted continuance of labor, without any stated times of recalling them to the worship of their Maker." Cooley's Blackstone, Vol. 2, Book 4, star pages 63 and 64.

Daniel Webster says: "The longer I live the more highly do I estimate the Christian Sabbath, and the more grateful do I feel to those who impress its importance on the community."

Emerson says: "The Sunday is the core of our civilization, dedicated to thought and reverence. It invites to the noblest solitude and the noblest society."

Macauley says: "If the Sunday had not been observed as a day of rest during the last three centuries, I have not the slightest doubt that we should have been at this moment a poorer people and less civilized."

Henry Ward Beecher says: "Sunday is the common people's great liberty day and they are bound to see to it that work does not come into it." Dictionary of Thought, Edwards, verbum "Sabbath."

(4) Excluding from our consideration the opinion evidence, reasonable minds under a correct interpretation of the statute could not reach any other conclusion than that the labor performed by appellant and his employees was not that of daily necessity, comfort or charity. The qualifying word "daily" is significant of the kind of necessity. It must be such as is required to meet a daily need.

In construing the term "necessity" we have given it a liberal rather than a literal interpretation, holding that an absolute unavoidable physical necessity is not meant, but rather an economical and moral necessity. It is said in *Shipley* v. *State,* 61 Ark. 219: "If there is a moral fitness or propriety for the work done in the accomplishment of a lawful object, under the circumstances of any

case, such work may be regarded a necessity, in the sense of the statute.'' See also, *State* v. *Collett,* 72 Ark. 169; *Barefield* v. *State,* 85 Ark. 135; see *Turner* v. *State,* 85 Ark. 188.

But this court, in *Quarles* v. *State,* 55 Ark. 10, has held upon a state of facts which can not be distinguished, in principle, from the facts here proved that the manager of a public theatre who sells tickets for and superintends an entertainment therein on Sunday is guilty of laboring on the Sabbath within the meaning of our statute. See also, *Lyric Theatre* v. *State,* 98 Ark. 437.

The Supreme Court of Connecticut, in a similar case, held that the sales on Sunday of tickets to a moving picture show to be given that evening in an opera house, was not a work of necessity or mercy. *State* v. *Ryan,* 80 Conn. 582.

Appellant having admitted that he performed the labor as charged, the burden was upon him to show by competent evidence that the labor done was a work of necessity. *Lee Wilson & Co.* v. *State,* 125 Ark. 159. This he has failed to do. The judgment is therefore correct, and it is affirmed.