No. 16,885.

JOURNEYMEN BARBERS, HAIRDRESSERS, COSMETOLOGISTS,
AND PROPRIETORS INTERNATIONAL UNION OF AMERICA,
LOCAL UNION NO. 205 *v.* INDUSTRIAL COMMISSION.
(260 P. [2d] 941)

Decided August 24, 1953.

Mr. PHILIP HORNBEIN, Mr. PHILIP HORNBEIN, JR., for
plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Peter L. Dye, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Plaintiff in error was defendant in the trial court and we will herein refer to it as the Union. Defendant in error was plaintiff below and we will hereinafter designate it as the Commission.

The action was brought here by writ of error to review the judgment of the district court of the City and County of Denver. That judgment validated the findings of fact and order of the Commission in a proceeding arising under the Labor Peace Act (S.L. '43, chapter 131), and gave to such findings and order of the Commission the effect of a decree of the district court. The procedure before the Commission was under the provisions of S.L. '43, chapter 131, section 8 (7).

The pertinent facts presented by this record are as follows: One, Glen E. Volzke, filed a verified complaint before the Commission in which he alleged, in substance, that for nineteen years he was the owner and operator of a union barber shop in Denver, and that on or about May 1, 1951, the Union submitted to him a new contract requiring him, as well as his employees, to become a member of the Union. He refused to sign the new contract so long as it contained this requirement, whereupon the Union withdrew approval of his shop by ordering the union shop card withdrawn. Volzke further alleged that the withdrawal of the union shop card was in violation of the provisions of the Labor Peace Act and would result in irreparable damage, and that his employees, as members of the Union, were obligated under the constitution of their organization to refuse to work if the union shop card was withdrawn. Upon an ex

parte hearing June 21, 1951, the Commission restrained the Union from removing the card pending final determination of the matter before the Commission. July 2d, the Union filed its answer to the petition, and a hearing on the issues was held by the Commission July 10th.

The Union appeared by its attorney and the parties entered into a stipulation concerning the pertinent facts. The final findings of fact and order of the Commission were as follows:

"On about May 1, 1951, respondent submitted to complainant, who has operated a barber shop employing Union help for some twenty years, a new contract containing the following paragraph:

" '8. Union Shop—All persons working in the shop (employer and employees) must secure and maintain membership in good standing in the Union. * * *'

"Upon complainant's refusal to sign said contract respondent caused to be removed from his place of business the Union Shop card, even though Article VII, Section 3 of respondent's Constitution provides that 'When the Union Shop card is removed from any shop for violation of the laws, rules, regulations and agreements all members employed therein shall immediately leave the employment of said shop.' "Complainant's employes have, for the most most, remained at work.

"The Referee is of the opinion, and so finds, that respondent is at liberty at any time to remove the Union Shop card from complainant's place of business if, by so doing, an illegal strike is not precipitated.

"The Referee is further of the opinion, and so finds, that Paragraph 8, above quoted, is an illegal requirement in that it is in violation of Section 6 (1) (b) of the Labor Peace Act of 1943.

"Further, the Referee is of the opinion that to require the owner and operator of a business to become a limited or nonactive member of his employes' Union is discriminatory and in violation of the cardinal principle of collective bargaining.

"It is, therefore, ordered: That respondent forthwith delete from the contract proferred to complainant that part of Paragraph 8 thereof requiring the employer to secure and maintain membership in respondent Union by striking the words in parentheses and inserting in lieu thereof the words 'except the employer,' and, as amended, to resubmit the agreement."

Following the entry of the foregoing order the Union failed to comply therewith and this action was instituted by the Commission for the purpose of compelling compliance.

There was admitted by stipulation, at the hearing before the Commission, the agreement which was tendered to Volzke for signature. Paragraph 8 thereof contains, inter alia, the following: "All persons working in the shop (employer and employees) must secure and maintain membership in good standing in the Union." The union shop card, the withdrawal of which forms the basis of this controversy, contains on the reverse side the following statement:

"This Card is issued in accordance with the laws, rules and regulations specified under the heading 'Rules Governing Union Shop Cards,' as appended hereto.

"The person or persons displaying this card do so in accordance with the rules stated below, and it is agreed, by the person or persons displaying this card, that for any violation of the rules below stated, he or they will give peaceable possession of the same to the local union under whose jurisdiction it is to be displayed, or a duly appointed or elected representative thereof; also, that the same will be given into the peaceable possession of the General President-Secretary-Treasurer of the Journeymen Barbers, Hairdressers and Cosmetologists' International Union of America, or a duly appointed representative, on demand."

Following the above is a statement of "Rules Governing Union Shop Cards," from which we quote the following pertinent provisions:

"The contract, or agreement, called for by these laws shall be so construed that the person or persons displaying the Shop Card shall specifically agree:

"(a)   To abide by the laws of the J. B. H. C. I. U. of A. governing Shop Cards and such laws as may be made in the future for the proper government of the same.

"(b)   To abide by the laws of the local union, now and in the future, with reference to prices, hours, wages, etc.

"(c)   To peaceably give up said Shop Card on demand of the local union or local executive board, through its duly appointed representative, for the violation of any local or international laws.

"(d)   To peaceably give up said Shop Card to the General President-Secretary-Treasurer, or a duly appointed representative, in case of the suspension or disbandment of the local union which issued it, or for any cause, when called upon to do so."

The contract between the Union and Volzke, under which the Union Shop Card originally was placed in Volzke's place of business, contained substantially the above provisions.

The constitution of the Union, article VII, section 3 is as follows:

"Any shop recognized as a union shop by the laws and principles of our union shall be entitled to display said Shop Card, provided that the proprietor or person duly authorized to conduct said shop shall have signed the agreements required by these laws.

"When the Union Shop Card is removed from any shop for violation of the laws, rules, regulations and agreements, all members employed therein shall immediately leave the employment of said shop. For failure to comply with the above the member or members will be subject to suspension and to penalties as provided for in Article XIII of this Constitution."

Article VIII, section 3, of said constitution provides as follows: "An employer shall be construed to be any person (or persons) who either owns or operates a bar-

ber or beauty shop and employs steadily one or more full-time barbers or beauty operators, provided, however, that employers who are working with the tools of the trade must become proprietor members of the local union and International Union of barbers or beauticians."

Article XVIII, section 3, provides in part as follows:

"A proprietor, shop owner, or employer working at the trade and who has never been a member of this organization and who desires to operate a union shop must make application for membership.

"A proprietor member working with the tools of the trade shall be entitled to voice and vote in meetings of the local union, but shall be ineligible to vote on matters pertaining to wages, hours of labor, etc. And shall also be ineligible to any office in the local or International Union or to act as delegate or alternate to conventions."

Counsel for the Union argue that the judgment should be reversed for the following reasons: (1) The union shop card, a registered trade-mark, is the property of the Union; that Volzke has no vested right to display the card; and that if he desires the benefits of union endorsement he must comply with all conditions imposed by the Union governing the display thereof; (2) to permit Volzke to display a union card when he does not in fact conform to the requirements of the Union would result in the perpetration of a fraud upon the public; (3) the Commission had no power to compel the Union to enter into a contract formulated by it since any contractual relationship must be based upon the voluntary action of the parties, and no tribunal may compel a person to enter into a contract against his will; (4) the contract under which Volzke received union recognition contained agreements on his part to comply with all rules of that organization. The Union is entitled to enforcement of those promises, and since Volzke refused to join, pursuant to the newly adopted rule, the contract is broken and the Union has the right to remove its shop card; (5) there is no prohibition contained in the Labor

Peace Act against an employer joining a union; and (6) since Volzke refused to enter into the new contract proposed by the Union, any decision as to its legality would be merely an advisory opinion.

On behalf of the Commission it is argued that: (1) The single issue in the case is whether a labor union can legally compel an employer of members of that union to himself become a member by inserting a provision in the labor contract requiring him to join; (2) the Union may not precipitate an illegal strike by means of withdrawing the union shop card for the reason that the owner-operator refuses to join the Union; (3) the Commission did not make a contract for the parties, nor did it compel them to enter into a contract, but acted to purge an existing contract of illegality; (4) if the illegal provision were permitted to remain in the contract, Volzke being thus compelled to become a member of the union would be discriminated against in that he would be denied full privileges of membership; (5) the declared public policy of Colorado is opposed to employers becoming members of the unions to which their employees belong; and (6) the findings of fact made by the Commission are supported by competent evidence and are conclusive upon this court.

Pertinent sections of the statutory law of Colorado, Session Laws 1943, chapter 131, are as follows:

Section 1: "The public policy of the state as to employment relations and collective bargaining, in the furtherance of which this Act is enacted, is declared to be as follows:

"(1) It recognizes that there are three major interests involved, namely: That of the public, the employee, and the employer. These three interests are to a considerable extent interrelated. It is the policy of the state to protect and promote each of these interests with due regard to the situation and to the rights of the others.

"(2) Industrial peace, regular and adequate income for the employee, and uninterrupted production of goods

and services are promotive of all of these interests. They are largely dependent upon the maintenance of fair, friendly and mutually satisfactory employment relations and the availability of suitable machinery for the peaceful adjustment of whatever legitimate controveries may arise. * * *"

Section 2 (15): "No labor dispute shall arise from the refusal of an employer to join a union or to cease work in his own business."

Section 6 (1): "It shall be an unfair labor practice for an employer individually or in concert with others:

\* \* \*

"(b) To initiate, create, dominate or interfere with the formation or administration of any labor organization or contribute financial support to it, * * *."

While all the contentions of the parties were fully presented in the proceedings before the Commission, the reasoning upon which the case was decided was that, under the statutes of Colorado, an employer is prohibited from contributing financial support to a union; that payment of initiation fees and dues amounts to "financial support" of the union; that an attempt to coerce an employer to join the union by withdrawal of the shop card is tantamount to calling a strike since in the absence of the shop card union employees are obligated to cease work; and that such a walkout of employees would be an illegal strike under the provisions of the Labor Peace Act.

Questions to be Determined.

First: *Under the facts hereinabove set forth, does the Union have the right, based on Volzke's contract to conform to any and all rules adopted by the Union, to withdraw the Shop Card upon his refusal to agree to a rule which is opposed to the public policy of the State of Colorado as declared by the legislature?*

This question is answered in the negative. In substance, the argument of counsel for the Union upon this phase of the controversy is that Volzke has no right whatever to display the union shop card in his place of

business unless he adheres to any and all standards or requirements set by the Union, and that the Union, under the provisions of its contract with Volzke, could withdraw the shop card whenever it saw fit, for a just or unjust reason or for no reason at all. In support of this argument the case of *Foutts v. Journeymen Barbers,* 155 Ohio St. 573, 99 N.E. (2d) 782, is cited. In that case, among other statements, the court said: "Where one relies upon the recommendation and approval of another to build up his business without any agreement limiting the causes for which such recommendation and approval may be discontinued, such one necessarily runs the risk that such other may, without just cause, determine to discontinue such recommendation and approval."

One other case is cited as being identical with the situation in the case at bar; it is *Rainwater v. Trimble,* 207 Ga. 306, 61 S.E. (2d) 420, in which the Supreme Court of Georgia held that an employer was bound by the terms of the agreement which he had signed with the union. We quote the following from the opinion in that case: "The employer barber agrees to abide by the rules of the union governing the display of this card—not only the rules in existence at the time he acquires the card, but all other rules as may be made in the future. The Union having amended its rules governing the display of the card by requiring the employer barber to join the union in order to retain the use of the card, this was in accordance with the terms of the agreement. Though the membership offered the employer barbers is a limited membership, yet, it being a rule adopted by the union, and there being nothing in the agreement limiting the effect of future rules, such action was covered by the terms of the agreement, which should be binding unless it is in contravention of some rule of law."

An important element which distinguishes the two cases above cited from the case at bar is that no statutory provisions comparable to the Colorado statutes hereinabove mentioned were in effect. This is apparent

in the opinion of the Georgia court wherein it is stated, "Under our labor laws * * * we find no provision that would invalidate the agreement as to the use of the union card, or authorize the trial judge to enjoin its enforcement."

In *Foutts v. Journeymen Barbers, supra,* the absence of statutory provisions controlling the issue is specifically pointed out. The Ohio court, in directing attention to a case decided by the Supreme Court of Wisconsin under a statute synonymous with that of Colorado, stated, "There are not even any comparable statutory provisions in our State." The Ohio decision was by a divided court and the strong dissenting opinion would seem to indicate clearly that the Ohio court would have reached a different conclusion if statutes comparable to the provisions of the Colorado Act had been in effect. Even in the absence of the pertinent statutes governing the instant case, we doubt the right of the Union to arbitrarily or capriciously refuse union recognition to one who conforms to all its reasonable and legal rules. We think it unquestionably is true that Volzke, under his contract with the Union, was required to abide by all such reasonable and legal rules which might be adopted by it. However he could not bind himself by contract to obey a rule adopted in the future which would compel a course of conduct contrary to the public policy of the State of Colorado as declared by the legislature. Our statute specifically provides that the public interest is interrelated with the interests of employee and employer, and that, "Fair, friendly and mutually satisfactory employment relations and the availability of suitable machinery for the peaceable adjustment of whatever legitimate controversies may arise," are essential in the protection and promotion of these interests. Even without the other pertinent statutory provisions to which reference is made hereinabove, this declaration of public policy would prevent the enforcement of a rule which would appear to the judiciary to be so unreasonable as

not to have been within the contemplation of the parties at the time the contract was entered into, under which a union shop card was placed in the employer's place of business.

Second: *Under the pertinent provisions of the Colorado statutes governing labor relations, and the uncontradicted facts hereinabove set forth, does the act of the Union in withdrawing the shop card from Volzke's place of business violate the public policy of the State of Colorado in labor relations as declared by the legislature?*

This question is answered in the affirmative for the following three reasons, any one of which amply justifies the position of Volzke and requires affirmance of the judgment.

First. The very basis of the whole controversy is that the employer refused to join the Union and that he refused, as an alternative, to stop working with the tools of his trade in his own place of business. Our statute contains language which is unmistakable in meaning, as follows: "No labor dispute shall arise from the refusal of an employer to join a union or to cease work in his own business." An act which cannot give rise to a legal labor dispute cannot become the basis of a rupture of harmonious labor relations which admittedly existed prior to that act. A labor union, or an employer, cannot use such an act as the basis for disturbing pre-existing labor relations. To attempt any other construction would be to abandon all logic and reason, to ignore the plain meaning of words, and to discard all fundamental rules of statutory construction. Argument that the withdrawal of the union shop card did not disturb existing labor relations is far fetched and unrealistic.

Second. Our statute (S.L. '43, chapter 131, section 6 (1) [b] provides that it shall be an unfair labor practice for an employer to contribute financial support to a labor organization. Admittedly, if Volzke is compelled to join the Union he must pay an initiation fee and dues. The best-reasoned cases decided in jurisdic-

tions having comparable statutory provisions are to the effect that an employer cannot be compelled to join a union if contributions in the form of dues and initiation fees are required. The sound reasoning upon which this conclusion rests is well stated in *Wisconsin Employment Relations Board v. Journeymen Barbers, Hairdressers & Cosmetologists International Union of American, Local 379B*, 256 Wis. 77, 39 N.W. (2d) 725, from which we quote the following: "The term 'financial support' as used in the statute is not limited in any way,—it is used in its broadest sense. The financial support of unions consists chiefly if not wholly of the dues paid by its members. If dues paid by members would constitute financial support for a union the court fails to see why dues paid by employers would not also constitute financial support of the union. It is true that the term 'financial support' is much broader than the mere payment of dues and covers and includes financial support of any kind, character, or description, whether large or small in amount." To like effect is *Di Leo v. Daneault* (Mass.), 109 N.E. (2d) 824. If Volzke had yielded to the union demand he would have been guilty of an unfair labor practice under our statute. His refusal to comply cannot be made the basis for conduct, on the part of the Union, which is designed and intended to disturb existing labor relations.

■ Third. Although the Union sought to compel Volzke to become a member and to pay dues and assessments, the membership offered to him was sharply limited. The constitution of the Union discriminates against the "proprietor member" in that he is denied the right to vote on important questions and is prohibited from holding office or acting in any official capacity as a representative of the Union. Upon this phase of the case we agree with the findings of the Commission that, "To require the owner and operator of a business to become a limited or nonactive member of his employees' union is discriminatory and in violation of the cardinal prin-

ciple of collective bargaining." The California Court of Appeal in the case of *Riviello v. Journeymen Barbers, etc.*, 88 Cal. App. (2d) 499, 199 P. (2d) 400, considered the identical question and, even in the absence of any statute comparable to our own, reached the conclusion which we entertain. We quote the following from the opinion in that case: "Here the record shows that the only type of membership offered to plaintiffs is a non-active membership. The defendants propose to picket to try to compel plaintiffs to become entirely sterile members of the union, without the right of any voice in union affairs. If they join they will have neither the right of seat nor voice in local meetings, and will not have the right to hold any union office or the right to attend conventions as union delegates. Apparently, the only 'right' they would possess would be the 'right' to pay dues. If they should join the union under such circumstances they would thus become amenable to the rules and sanctions of the union without the right to participate in the proceedings by which such rules and sanctions are passed. A clearer case of attempting to create a discriminated against class of members cannot be imagined. This is the focal point in this case. While, as already pointed out, in this state it is lawful to attempt to 'coerce peacefully' an employer who works at the trade to induce him to join the union, it seems too clear to require lengthy discussion that such activity cannot be held to be lawful unless full membership in the union is offered. According to the uncontradicted evidence, these plaintiffs cannot remain in business unless they have a union card. The defendants are threatening to remove that card and to picket unless plaintiffs become nonactive members of the union. In other words, plaintiffs cannot earn a living at their trade unless they join the union, and, if they join, they become sterile members. That cannot and should not be held to be a proper and lawful labor objective."

We know of no case in which a court of last

resort has given a construction to statutes similar to our own which is out of harmony with the views of this court.. The important issues in this case are controlled by statute. As stated by Mr. Cooley in his work on Constitutional Limitations (201, 202), it is not within the province of the judiciary to "run a race of opinions upon points of right, reason and expedience with the law-making power." In the construction of statutes courts are not guardians of the rights of the people except as those rights are secured by constitutional provision, and if a statute does not offend the Constitution it is the duty of courts to carry it into execution according to its true intent and purpose. "We cannot pass upon its expediency or policy; those are questions upon which the legislature has passed, and its judgment cannot be reviewed by the courts." *People ex rel. v. Fleming,* 10 Colo. 553, 16 Pac. 298.

We have examined other arguments advanced for reversal of the judgment and find them without merit.

The judgment is affirmed.