No. 17,779.

MAX MOSKO, ET AL. *v*. DUKE W. DUNBAR,
ATTORNEY GENERAL, ET AL.
(309 P. [2d] 581)

Decided April 1, 1957.    Rehearing denied April 29, 1957.

Messrs. MOSKO & SLATKIN, for plaintiffs in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E.
HICKEY, Deputy, Mr. GEORGE O. PRIEST, District Attorney, First Judicial District, Pro Se and for Charles
Foster and Carl Enlow, Sheriffs, defendants in error.

Mr. EMORY L. O'CONNELL, Messrs. KARA & RICE, Messrs. JENKINS, STEWART & TURSI, Mr. GAIL H. HADDOCK, Mr. MAX D. MELVILLE, Mr. FRED M. WINNER, Amici Curiae.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

THIS matter is presented to this court on an agreed *Statement of The Case,* the pertinent provisions thereof being:

1. Plaintiffs in error, referred to herein as plaintiffs are engaged in the business of buying and selling motor vehicles, each is duly licensed as a motor vehicle dealer under C.R.S. '53, 13-11.

2. Plaintiffs prior to April 8, 1955, had kept their places of business open on Sundays and desire to continue so to do.

3. The Fortieth General Assembly of the state of Colorado enacted a statute known as House Bill No. 45, effective April 8, 1955, now C.R.S. '53, 13-20-1, et seq., in words as follows:

"Section 1. — Definitions — The term 'motor vehicle' as used in this act shall mean every vehicle intended primarily for use and operation on the public highways, which is self-propelled; and every vehicle intended primarily for operation on the public highways which is not driven or propelled by its own power, but which is designed either to be attached to or become a part of a self-propelled vehicle; but not including farm tractors and other machines and tools used in the production, harvesting and care of farm products.

"Section 2. — Sunday closing — No person, firm or corporation, whether owner, proprietor, agent or employee, shall keep open, operate or assist in keeping open or operating any place or premises or residences whether open or closed, for the purpose of selling, bar-

tering or exchanging, or offering for sale, barter or exchange, any motor vehicle or motor vehicles, whether new, used or second hand, on the first day of the week, commonly called Sunday; and provided, however, that this act shall not apply to the opening of an establishment or place of business on the said first day of the week for other purposes, such as the sale of petroleum products, tires, automobile accessories, or for the purpose of operating and conducting a motor vehicle repair shop, or for the purpose of supplying such services as towing or wrecking.

"Section 3. — Penalties — Any person, firm, partnership, or corporation who violates any of the provisions of this act shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than seventy-five dollars ($75.00) nor more than one thousand dollars ($1,000.00), or by imprisonment in the county jail for a period not to exceed six months, or the court, in its discretion, may suspend or revoke the Colorado Motor Vehicle Dealer's License issued under the provisions of Article II of Chapter 13, Colorado Revised Statutes 1953, or by such fine and imprisonment and suspension or revocation.

"Section 4. — Safety Clause — The General Assembly hereby finds, determines and declares that this act is necessary for the immediate preservation of the public peace, health and safety."

4. Plaintiffs contend that said House Bill No. 45 is unconstitutional and void; defendants contend that it is constitutional. The parties pray for a declaratory judgment resolving this constitutional question.

5. Plaintiffs contend that House Bill No. 45 is in contravention of:

(a) Article 5, Section 25 of the Colorado Constitution.

(b) Article 14, Section 1 of the Amendments to the Constitution of the United States.

6. The trial court found House Bill No. 45 constitutional.

██ It is elementary that every regularly adopted legislative act is presumed to be constitutional, and that one attacking the validity thereof has the burden of showing it unconstitutional beyond a reasonable doubt. *Rinn v. Bedford,* 102 Colo. 475, 84 P. (2d) 827; *Eachus v. People,* 124 Colo. 454, 238 P. (2d) 885; *Heitsch v. Kavanagh* (Mich.) 200 F. (2d) 178, cert. denied 345 U. S. 939, 97 L. Ed. 1365.

Under our system of government only the legislature can enact laws and it is the legislature's right and duty to determine what laws are desirable. It is well established by an unbroken line of decisions of this court, as well as of the Federal courts, that it is within the exclusive province of the legislature to determine the necessity, expediency, wisdom, fairness and justness of the law enacted.

The rule is well stated by Justice Moore in *Barbers Union v. Industrial Commission,* 128 Colo. 121, 260 P. (2d) 941:

"* * * In the construction of statutes courts are not guardians of the rights of the people except as those rights are secured by constitutional provision, and if a statute does not offend the constitution it is the duty of courts to carry it into execution according to its intent and purpose. 'We cannot pass upon its expediency or policy; those are questions upon which the legislature has passed, and its judgment cannot be reviewed by the Courts.' *People ex rel. v. Fleming,* 10 Colo. 553, 16 Pac. 298."

In *Heitsch v. Kavanagh, supra,* the court uses the following language:

"It was within the power of Congress to tax both gifts and estates and its motives are not open to judicial scrutiny * * *. The motives of Congress in enacting laws are beyond the scope of judicial inquiry for the purpose of questioning such legislation. The burden is upon one who attacks the constitutionality of a statute, and the presumption is in favor of constitutionality."

Plaintiffs contend that the statute under attack is in contravention of Art. XIV, section 1 of the Amendments to the Constitution of the United States, which section provides:

"Citizenship defined — privileges of citizens. — All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

This contention is clearly without merit. The Supreme Court of the United States, vested with the final power to determine whether a law deprives a party of rights guaranteed by the 14th Amendment, has on numerous occasions ruled contrary to counsel's contentions.

In *Petit v. Minnesota,* 177 U. S. 164, 20 S. Ct. 666, 44 L. Ed. 716, the Supreme Court of the United States passed on the question raised by counsel in this case. A Minnesota statute prohibited any person from keeping open a barber shop on Sunday. Petit had been convicted of violation of the statute. The United States Supreme Court affirmed the conviction and said:

"The court pointed out that the law did not forbid a man shaving himself or getting someone else to shave him, but the keeping open a barber shop for that purpose on Sunday; that the object mainly was to protect the employees by insuring them a day of rest; and said: 'Courts will take judicial notice of the fact that, in view of the custom to keep barber shops open in the evening as well as in the day, the employees in them work more, an during later, hours than those engaged in most other occupations, and that this is especially true on Saturday afternoons and evenings; also that, owing to the habit

of so many men to postpone getting shaved until Sunday, if such shops were to be permitted to be kept open on Sunday, the employees would ordinarily be deprived of rest during half of that day."

In *Noble State Bank v. Haskell*, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112; on rehearing 219 U. S. 575, 31 S. Ct. 299, 55 L. Ed. 341, the court passed upon the constitutionality of an Oklahoma statute requiring all state banks to pay 1% of their average daily deposits into a depositors guaranty fund to secure full payment of *all* deposits in *all* state banks. Noble State Bank, without success, attacked this law in the Oklahoma courts on the ground that it contravened several provisions of the Constitution of the State of Oklahoma and on the further ground that it was in violation of the 14th Amendment. Justice Holmes, in holding the legislation free of constitutional inhibitions, said:

"It may be said in a general way that the police power extends to all the great public needs. Camfield v. United States, 167 U. S. 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare.

\* \* \*

"\* \* \* We cannot say that the public interests to which we have adverted, and others, are not sufficient to warrant the state in taking the whole business of banking under its control. On the contrary, we are of opinion that it may go on from regulation to prohibition except upon such conditions as it may prescribe. In short, when the Oklahoma legislature declares by implication that free banking is a public danger, and that incorporation, inspection, and the above-described co-operation are necessary safeguards, this court certainly cannot say that it is wrong. \* \* \*"

On petition for rehearing Justice Holmes, by way of clarification, made the following observations:

"\* \* \* We fully understand the practical importance

of the question, and the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern. * * * The propositions with regard to it, however, in any form, are rather in the nature of preliminaries. For in this case there is no out-and-out unconditional taking at all. The payment can be avoided by going out of the banking business, and is required only as a condition for keeping on, from corporations created by the state. * * *"

When and if plaintiffs' contentions are presented to the United States Supreme Court, the last quotation from Justice Holmes, properly paraphrased, might well be the comfortless answer to plaintiffs' contentions that they are being deprived of rights guaranteed by the 14th Amendment.

The Supreme Court of the United States in *Williamson v. Lee Optical of Oklahoma*, 348 U. S. 483, 75 S. Ct. 461, 99 L. Ed. 563, decided March 28, 1955, fourteen days prior to the effective date of House Bill No. 45, seventeen days prior to the inception of this litigation, in a broad and far-reaching decision, without any dissent, answers plaintiffs' contentions in the following language:

"The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought * * *. We emphasize again what Chief Justice Waite said in Munn v. State of Illinois, 94 U. S. 113, 134, 24 L. Ed. 77, 'for protection against abuses by legislatures the people must resort to the polls, not to the courts.' "

Plaintiffs in their brief as grounds for holding House Bill No. 45 unconstitutional, state:

"The statute is void because it does not uniformly require closing on Sunday by all persons in a certain business."

In other words plaintiffs contend that this is *class legislation* prohibited by Article 5, section 25, Colorado Constitution, which provides:

"Special legislation prohibited.—The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say; for granting divorces; * * *. In all other cases, where a general law can be made applicable, no special law shall be enacted."

Complete answer to plaintiffs' contention is found in *Rosenbaum v. Denver,* 102 Colo. 530, 81 P. (2d) 760, in which this court held that an ordinance of the City of Denver, in words almost identical with the wording of House Bill No. 45, certainly containing no substantial difference, was valid and not in contravention of the State or Federal Constitutions.

Justice Knous delivered the opinion of the Court, with only Justice Bouck, for unexpressed reasons, dissenting. At pages 533 and 534 of the opinion appears the following:

"This leaves as the only matter remaining for consideration the question of whether or not the ordinance violates section 25, article V of the state Constitution because it is class or special legislation. * * *

* * *

"The inhibition against class legislation in Sunday regulations arises when the effect of the law is to prohibit a carrying on of a legitimate business or occupation while allowing other businesses or occupations not reasonably to be distinguished from those prohibited to be carried on freely. *Denver v. Bach,* 26 Colo. 530, 58 Pac. 1089.

"It is to be observed that the ordinance before us applies alike to all those who are engaged in selling, bartering or exchanging new, used or secondhand motor vehicles. At least, so far as the record discloses, the business of selling automobiles new or secondhand is as particular and distinct as the business of barbering. It is reasonably to be distinguished from all other busi-

nesses and no general merchandising business is competitive as against it.

"No showing is made, nor is it suggested, that by virtue of exceptions in the ordinance under consideration or any other ordinance of the city of Denver is it lawful for any person to sell motor vehicles of any type in Denver on Sunday. By this circumstance any charge of discrimination, a characteristic of class or special legislation, is eliminated."

*Rosenbaum v. Denver, supra,* was decided July 11, 1938. It is common knowledge that since that date the automobile business has expanded, grown and developed until as of April 8, 1955, it is difficult to conceive of any individual, group of individuals, corporation, private or municipal, State or Nation, that has not felt the impact of the automobile industry.

The first legislation in Colorado touching on automobiles was by the Seventeenth General Assembly in 1909. That Assembly provided the first Colorado legislative definition of an automobile as follows:

Chapter 137, Session Laws 1909.

"Section 1. For the purpose of this act the term 'automobile' shall be held to embrace and mean and is hereby defined to mean any vehicle driven by motive power other than animal power or motive power supplied solely by the muscular exertion of a human being."

Section 2 of the act provided punishment for any person who shall, "tamper with * * * enter upon and start in motion * * * any automobile without the knowledge and consent of the owner * * *."

A modest beginning. Not until 1913 did the legislature impose any restrictions upon the ownership or use of automobiles. Since 1917 every General Assembly of the State of Colorado has enacted legislation affecting automobiles or motor vehicles. The Fortieth General Assembly (1955) not only enacted House Bill No. 45 but also enacted fifteen additional bills touching on some

branch of the motor vehicle business or the use of motor vehicles.

Today the automobile has become a definite and well-established part of our way of life; its use, operation, manufacture, sale, license, registration, taxation, insurance, theft and many other related matters have received special legislative recognition and attention. Certainly the legislature has treated the motor vehicle business as a special type of business. The public has accepted it as such. Were we to hold that it is arbitrary and unreasonable action on the part of the legislature to place motor vehicle dealers in a classification separate and apart from merchants in general, it would be to close our eyes to reality. March of time and events subsequent to *Rosenbaum v. Denver, supra,* only serve to confirm the correctness of that decision.

*Gundaker Central Motors, Inc. v. Gassert, et al,* (N.J.) 127 A. (2d) 566, decided December 17, 1956, holds that a statute of the State of New Jersey prohibiting the sale of new or used cars on Sunday was not in contravention of the New Jersey Constitutional provisions or due process as defined by the U.S. Constitution.

Vanderbilt, C. J., in his opinion, uses the following language:

"The State has the power, in the interests of the common good, to enact all manner of laws reasonably designed for the protection of the public health, welfare, safety and morals. The exercise of the power may cause individual hardship, or even limit the freedom of individual action; but so long as there is some degree of reasonable necessity to protect the legitimate interests of the public, and the regulation resulting from the use of the power is not arbitrary or oppressive, the greater good for the greater number must prevail and individual inconveniences must be suffered as the price to be paid for living in a well-ordered society. * * *

\* \* \*

"Accordingly, the constitutional guarantees of due

process and equal protection are elements to be accounted for in the exercise of the State's police power; they are not elements that in any way limit the subjects over which the State may exercise its power, but elements which condition the exertion of that power by their fundamental demands. * * *

* * *

"Moreover, 'equal protection of the laws,' which demands that all persons similarly situated be dealt with alike, is accomplished by the avoidance of 'arbitrary discrimination between persons similarly circumstanced,' Id., 9 N.J. at page 418, 88 A. 2d at page 613. Thus, legislation that treats all persons within a class reasonably selected for regulation in a like or even merely in a similar manner, satisfies the mandates of the State and Federal Constitutions, * * *

* * *

"While a measure grounded in the exercise of the police power must tend to accomplish the basic purpose of its enactment, a large measure of discretion is vested in the Legislature to determine not only what regulations are necessary to protect the public good and welfare but also the appropriate means of accomplishing these ends. Its wisdom or the means selected are not subject to review or interference by the courts except in the protection of fundamental constitutional rights, * * *

"Consequently, it is the duty of this court to uphold legislation unless there is no room for doubt as to its violation of constitutional provisions, * * *

"The statutes in question here apply to all automobile dealers within the State, without distinction as to class, type, location or otherwise. All are required to close. Fundamentally then, they satisfy the initial inquiry as to equal protection. No economic advantage can be gained by any one within this State by reason of the Sunday regulation because no persons other than those covered by the enactments can engage in the business

of selling motor vehicles, R.S. 39:10-19, N.J.S.A. Thus, all motor vehicle dealers are protected in their businesses and no substantial loss of revenues can result where the product they deal in is unobtainable elsewhere within the State. The cars that would be sold on Sunday will now be sold on the other days in the week and probably to the same prospective purchasers.

"The fact that the sale of motor vehicles is singled out for legislative treatment is no ground for complaint if there is any reasonable basis for such action, Washington National Insurance Co. v. Board of Review, 1 N.J. 545, 64 A. 2d 443 (1949); Jamouneau v. Harner, 16 N.J. 500, 109 A. 2d 640 (1954), certiorari denied 349 U.S. 904, 75 S. Ct. 580, 99 L. Ed. 1241 (1955); Guill v. Mayor and Council, of City of Hoboken, supra, 21 N.J. 583, 122 A. 2d 881 (1956). And there is reasonable basis if the buying and selling of motor vehicles on Sunday has effects inimical to the public good and welfare. Under the police power 'the State may protect its citizens from physical and moral debasement which comes from uninterrupted labor'; see State v. Fair Lawn Service Center, Inc., supra, 20 N.J. 468, 474, 483, 120 A. 2d 233, 241 (1956)."

In *McClelland v. The City of Denver*, 36 Colo. 486, 86 Pac. 126, this court held an ordinance of the City of Denver requiring all barber shops to close on Sunday was valid and did not deprive barbers of any constitutional rights.

Plaintiffs as a final contention claim that House Bill No. 45 is void, "for the reason that it unduly prefers a dealer in motor vehicles used for one purpose over the identical vehicles used for another purpose."

In support of this contention counsel points out that House Bill No. 45 covers *all self-propelled vehicles intended primarily for use on the public highways* and in the same section there is *excepted* from the operation of the act *farm tractors and other machines and tools used in the production, harvesting and care of farm*

*products.* The contention is novel but abortive. Nothing is *excepted* from the operation of the act; its definition of a motor vehicle in section 1 of the act is in clear and concise language. The fact that such definition states that motor vehicle as defined does not *include* farm tractors and other machines and tools used in the production, harvesting and care of farm products does not create an exception or render the statute indefinite or present any added problem of interpretation. The fact that the statute expressly states that it does not prohibit keeping open for "other purposes" creates no ambiguity. These are only statements of the obvious.

Section 2 of the act provides:

"No person * * * shall keep open * * * any place * * * for the purpose of selling * * * any motor vehicles, whether new, used or second hand, on * * * Sunday."

There are no *provisos* or *exceptions* in House Bill No. 45. The alleged ambiguities and exceptions are more imaginary than real.

The finding and determination of the trial court that House Bill No. 45, being Chapter 81 of the 1955 Session Laws of the state of Colorado, does not offend against the constitutional provisions mentioned was correct.

The judgment is, therefore, affirmed.

MR. JUSTICE FRANTZ specially concurs.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE KNAUSS and MR. JUSTICE SUTTON dissent.

MR. JUSTICE FRANTZ specially concurring:

The constitutional questions involved in this controversy are of utmost importance, and the determination thereof by this court must be far-reaching in its consequences to those engaged in the automotive business. Hence, while concurring in the opinion of Justice Hall, an expression of opinion on other facets of the problem which appear equally important to the writer hereof seems desirable and appropriate at this time.

A declaratory judgment was entered by the lower court, holding that Chapter 81 Session Laws of Colorado 1955 was a valid enactment except for one matter not material to this case. Reversal of this judgment is sought.

The act in question is set forth in extenso in the opinion of Justice Hall. It prohibits the sale of motor vehicles, as therein defined, on Sunday.

Invalidity of the act is asserted on the ground that it is a special law, and hence in contravention of (1) Art. V, Sec. 25 of the Constitution of Colorado, and (2) the 14th Amendment to the Constitution of the United States.

That the assailed act is not a special law so as to infringe upon these constitutional provisions has been settled by pronouncements of this court. *Rosenbaum v. Denver,* 102 Colo. 530, 81 P. (2d) 760; *McClelland v. Denver,* 36 Colo. 486, 86 Pac. 126. And that the Supreme Court of the United States would hold the act not to be in conflict with the 14th Amendment to the federal constitution is clearly indicated in its decision in *Petit v. Minnesota,* 177 U.S. 164, 20 S.Ct. 666, 44 L.Ed. 716. Where the Supreme Court of the United States has declared a statute similar to the one under attack here inoffensive to a provision of the federal constitution, we should be chary in refusing to accept its decision as authority. *Lindsley v. Werner,* 86 Colo. 545, 283 Pac. 534; *American Federation v. Reilly,* 113 Colo. 90, 155 P. (2d) 145.

Since the general and permissible subject matter of legislation of the character under consideration is the establishment of a periodical day of rest, it would be possible, no doubt, to include in such legislation every activity of the people which tends to interfere with or prevent that objective. But it is not necessary to the licitness of such legislation that it shall include every possible activity which might be included in the subject matter. "The fact * * * that * * * in the judgment of some [it] does not go far enough, and should include all

other avocations, or be general, is no reason why it should not be upheld to the extent it does go, when, though limited in its application, it affects alike all persons following the particular avocation inhibited on Sunday." *McClelland v. Denver, supra.* The demands of the Constitution are satisfied if all similarly situated are included and none is omitted whose relationship to the subject matter cannot by reason be distinguished from that of those included.

At the core of this problem is public policy. Has the statute sanction in the declared policy of this state? Does it bear some reasonable, appreciable relation to the public health, safety, morals or welfare?

Public policy is not only revealed by the whole body of the existing statutory and constitutional law, but is adumbrated in traditional concepts of the common law as the same matured in the climate of the culture, customs, manners, maxims and Judeo-Christian ethic of the people, and thus became part and parcel of the warp and woof of the fabric of government. *Updegraph v. Commonwealth,* 11 S.&R. Rep. (Pa.) 394; *Lindenmuller v. People,* 33 Barb. (N.Y.) 548; *State v. Ambs,* 20 Mo. 214; *Rosenbaum v. State,* 131 Ark 251, 199 S.W. 388, L.R.A. 1918 B 1109; *Harrison v. McLeod,* 141 Fla. 804, 194 So. 247; *Rogers v. State,* 60 Ga. App. 722, 4 S.E. (2d) 918. See *People v. Stanley,* 81 Colo. 276, 255 Pac. 610. To gainsay the traditional aspects of the common law is to deliberately deny historical fact—indeed, is to shake confidence in the common law itself, which definitely is nothing more than a bundle of traditional principles evolved from judicial experience.

Let us first consider the statutory law as it evinces an established policy of this state. The body of our statutory law has unmistakably set apart Sunday from other days of the week.

Thus, we note that Colorado Revised Statutes 1953 contains a number of provisions giving due recognition to the observance of Sunday as a day of cessation from

secular activity. Sec. 27-1-4 (5) forbids cleaning and dyeing establishments to remain open on Sundays and other holidays. Sec. 40-8-14 provides that "any person who shall knowingly disturb the peace and good order of society, by labor or amusement on the first day of the week, commonly called Sunday, works of necessity and charity excepted, shall be fined . . ."

Sec. 40-8-15 makes it a misdemeanor for one who "shall be guilty of any noise, rout or amusement on the first day of the week, called Sunday, whereby the peace of any private family may be disturbed, or who shall, by a disorderly or immoral conduct, interrupt or disturb the meeting, processions or ceremonies of any religious denomination, on either a Sunday or week day . . ."

Sec. 40-12-20 and 21 makes it a misdemeanor subject to fine "for any person to carry on the business of barbering on Sunday in any city of the first or second class."

By Sec. 67-1-1 Sunday is recognized as a holiday. Certain holidays are designated, and it is ordained that if one of them fall on Sunday, the Monday following becomes such holiday, and the section concludes with the provision that nothing therein shall "prevent the issuing or serving of process on any of the days above mentioned or on Sunday."

Additional holidays are created by Sec. 67-1-2 with like provision for Monday following Sunday being a holiday in the event the holiday falls on a Sunday. A reasonable construction of this section permits banks of various kinds to operate on the holiday, and inferentially indicates they shall not operate on Sunday. It also permits the issuance or service of process on any holiday or on Sunday.

According to Sec. 37-1-20, courts shall not be open and shall not transact any judicial business on Sunday or any legal holiday except in certain emergency situations.

The sale of intoxicating liquors is permitted on Sun-

day by Sec. 75-2-3 (4) on a more restricted basis than on other days of the week.

Our Rules of Civil Procedure, in computing time, make provision in case certain events fall on or include Sunday. (Rule 6, R.C.P. Colo.)

By Rule 102 (i) R.C.P. Colo. a writ of attachment may be executed on a Sunday or a legal holiday in the event it is made to appear that it is necessary to do so on such day.

So much for the statutory law which evidences public policy concerning Sundays. We will now consider the constitution of the State of Colorado on this matter.

Our constitution begins with a noble preamble. It pays due homage to the "Supreme Ruler of the Universe" in these words:

"We, the people of Colorado, with profound reverence for the Supreme Ruler of the Universe, in order to form a more independent and perfect government; establish justice; insure tranquility; provide for the common defense; promote the general welfare and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the 'State of Colorado.' "

By Art. II, Sec. 4, "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed . . ." The same section provides that "the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations . . ."

It is provided by Art. IV, Sec. 18, that the seal of the territory of Colorado become the "Great Seal of the State of Colorado." The motto thereon is "Nil sine Numine"—"Nothing without the Deity." This territorial seal required that there appear thereon as a crest "above the shield, the eye of God."

From what did this public policy, evidenced by the constitution and the statutes hereinabove considered, spring? The answer to this question requires a brief

analysis of history as the same forms the traditional background in which they were conceived.

These constitutional and statutory provisions had their beginnings in an atmosphere impregnated with the religious spirit of the times and with the moral law. *Updegraph v. Commonwealth, supra; Lindenmuller v. People, supra; State v. Ambs, supra; Rosenbaum v. State, supra; Harrison v. McLeod, supra; Rogers v. State, supra.* Insofar as Sunday laws are concerned, it has been said that they "have been on the books for more than three thousand years and have been the law of this country since Captain John Smith poured cold water down the sleeves of the cavaliers at Jamestown as a punishment for swearing." *Harrison v. McLeod, supra.* The Decalogue is exceedingly high and very old authority for rest from toil one day in seven and making that day of rest a sacred day. With the advent of Christianity, the old Sabbath under the Hebrew dispensation was, as to Christians, changed to Sunday, commemorative of and associated with the divine event of Easter. Thus, it came about that the common law and the statutes and constitutions of our states were colored with Judeo-Christian concepts.

As time went on, the religious aspects of Sunday laws lost most of their efficacy because of the constitutional provisions requiring separation of church and state; however, they were recognized as a valid exercise of the police power of the state. Their sanction as a proper exercise of the police power is well stated in the case of *McClelland v. Denver, supra,* in these words: "Keeping open places of business on Sunday, works of necessity and charity excepted, is a public and serious interference with the observance of the day. Such conduct is offensive to the moral sense of the community. It disturbs the peace and good order of society, and invites others to violate the law on the subject. The stability of government, as well as the welfare and interest of society, render it necessary that the day of rest should be uni-

form, and that its observance should be compulsory, not by way of enforcing the conscience of those upon whom the law operates, but by way of protection to those who desire, or are entitled to, the day, and who, unless protected by a law requiring usual secular pursuits to be suspended at regularly recurring intervals, would be deprived of the full benefits which the law contemplates shall result from the observance of Sunday as a day of rest."

We cannot ignore or impugn the religious and moral motivations that gave warmth, tone and color to the policy of this state as found in the quoted constitutional and statutory provisions. A court that fails or refuses to read these laws in the background of tradition or construes them contrary to their historical setting fails of performing its solemn function.

Even though Sunday laws are "essentially civil and not religious, and the statutes are not to be regarded, *in the present day,* as religious ordinances," 83 C.J.S. §3, pg. 801, yet the tradition from which they sprung has overtones of importance when we realize that a major segment of our society is still a religious people. This non-religious view arose, be it remembered, to establish and maintain the constitutional severance between church and state, not to overthrow or subvert religion, but to leave religion unfettered, thereby fostering the public policy of complete religious freedom. It is axiomatic that government is invigorated as religion flourishes, since the morals and ethics taught thereby tend to promote order. In view of the policy of the state, evinced by the constitutional and statutory provisions herein cited and their historical setting, we should be reluctant to overthrow *McClelland v. Denver, supra,* and *Rosenbaum v. Denver, supra.* Particularly should this be true because it might cast doubt upon the validity of that part of the body of our statutory law regulating secular activities on Sunday.

There is overwhelming reason why this court should

follow the doctrine of precedents, frequently referred to as the rule of stare decisis. Those who would overthrow *Rosenbaum v. Denver, supra,* and *McClelland v. Denver, supra,* overlook an important aspect of Sunday laws. True, it has not been touched upon in the briefs, but any consideration of the act in question would be to little purpose were we to leave untouched the point.

The arm of the civil power, under our public policy as made manifest in the constitutional and statutory law, foreshadowed by traditional concepts of the common law, is interposed to assist "the mild voice of Christianity * * * to secure the due observance of Sunday as a day of rest." *State v. Ambs. supra.* The statutorily imposed day of rest is consonant with and obviously necessary to the constitutional concept of religious freedom. The "free exercise and enjoyment of religious profession, without discrimination, shall forever hereafter be guaranteed." This is the mandate of our constitution. This fundamental right the courts have always zealously guarded. Constructions of laws which result in hampering persons from attendance at religious services have been scrupulously avoided. *Hamilton v. Montrose,* 109 Colo. 228, 124 P. (2d) 757.

The language of *State v. Ambs. supra,* is particularly pertinent and should be followed. It demonstrates why the questioned law should be held valid. "They [the framers of the constitution], then, who engrafted on our constitution the principles of religious freedom therein contained, did not regard the compulsory observance of Sunday as a day of rest, a violation of those principles. *They deemed a statute compelling the observance of Sunday necessary to secure a full enjoyment of the rights of conscience.* How could those who conscientiously believe that Sunday is hallowed time, to be devoted to the worship of God, enjoy themselves in its observance amidst all the turmoil and bustle of wordly pursuits, amidst scenes by which the day was desecrated, which they conscientiously believed to be holy? *The*

*Sunday law was not intended to compel people to go to church, or to perform any religious act, as an expression of preference for any particular creed or sect, but was designed to coerce a cessation from labor, that those who conscientiously believed that the day was set apart for the worship of God, might not be disturbed in the performance of their religious duties. Every man is free to use the day for the purpose for which it is set apart or not, as he pleases. If he sees proper to devote it to religious purposes, the law protects him from the disturbance of others; if he will not employ himself in religious duties, he is restrained from interrupting those who do. Thus the law, so far from affecting religious freedom, is a means by which the rights of conscience are enjoyed.* It cannot be maintained that the law exacting a cessation from labor on Sunday compels an act of religious worship. Because divines may teach their churches that the reverential observance of the Lord's day is an act of religious worship, it by no means follows that the prohibition of wordly labor on that day was designed by the general assembly as an act of religion. Such an idea can only be based on the supposition of an entire ignorance in the legislature of the nature of the worship which God exacts from his creatures. A compliance with the law, induced by a fear of its penalties, could never be regarded as an act acceptable to the Deity. No act of worship, unless dictated by heartfelt love, can be pleasing to the Almighty. God listens alone to the voice of the heart." (Emphasis supplied.) To the same effect, see *State v. Barnes,* 22 N.D. 18, 132 N.W. 215, 37 L.R.A.N.S. 114, Ann. Cas. 1913E 930.

There is another phase in which it may be said that there exists an appreciable relation to morals and welfare in the instant Sunday law. A spouse has a natural right to the society and companionship of the working spouse; the children have a natural right to the society and companionship of the working parent. *Daily v. Parker,* 152 F. (2d) 174; *Miller v. Monsen,* 228 Minn. 400,

37 N.W. (2d) 543; *Johnson v. Luhman,* 330 Ill. App. 598, 71 N.E. (2d) 811. See *Individual Interests in the Domestic Relation,* Dean Pound, 14 Mich.L.Rev. 177. Conceivably these rights may to some extent, if the act is held invalid, be taken away from the non-working spouse and the children. We have read much in recent times in connection with causes for divorce and causes for juvenile delinquency. One of the important causes for divorce is the lack of companionship between husband and wife, resulting in the spouses almost being total strangers to each other. Parents who have working and social engagements to keep to the extent that their children are left to shift for themselves create a condition conducive to juvenile delinquency. This court should be the first to fortify the family against widening the wedge by which causes for divorce or delinquency may be given additional impetus to reach flood stage.

A final point should be discussed. "It has been the *policy* of this commonwealth since 1868 to inhibit all labor on Sunday, works of charity and necessity excepted." *McClelland v. Denver, supra.* Thus spoke the court in citing C.R.S. '53, sec. 40-8-14. There have been cases in which courts have treated as a question of fact what constitutes a work of charity or necessity. It has been held that the legislature has the power to remove certain activities from a doubtful category, as being works of charity or necessity. The legislature may say that certain activities shall not be carried on on Sundays and thus remove them from the possibility of being asserted as works of charity or necessity. This was the holding of the court in *Petit v. Minnesota, supra.* There as here, they had a general law forbidding labor on Sunday, works of charity and necessity excepted, and later an amendment was adopted forbidding barbering on Sundays. The Supreme Court of the United States held the law not in violation of the federal constitution. It is submitted that, by the Sunday law now being considered, the designated motor vehicle dealers may not

invoke the exception of the general law, to-wit, that they are carrying on a work of necessity.

The foregoing represent reasons why we should follow stare decisis, and hold that the case of *Rosenbaum v. Denver* remains the law of this jurisdiction. If courts set themselves to zigzagging, to backing and filling, to building then tearing down, to knitting then ravelling, to deciding and then setting aside their own solemn pronouncements, they destroy the virtue of the law, which is that principles be applied uniformly and consistently. Only where the application is palpably wrong should we change position. *People v. Schaefer,* 129 Colo. 215, 268 P. (2d) 420. This is not such a case.

These are additional reasons why I concur in the opinion of Justice Hall.

MR. CHIEF JUSTICE MOORE dissenting.

I respectfully dissent. That the issues involved here are not as free from doubt as might be assumed by reading the court's opinion, I direct attention to the fact that prior to the granting of a rehearing in this cause, the views expressed in the majority opinion were rejected by a majority of this court as then constituted. That which I originally wrote as the majority opinion must now in somewhat different form appear as a dissent. The opinion written for the court as now constituted completely ignores basic constitutional guarantees, sweeps aside without mention solemn pronouncements of this court which heretofore have given some comfort to those who recoil at the imposition of unreasonable and arbitrary restraints upon the freedom of the citizen, and takes a long step toward destruction of whatever remains of freedom of the individual to carry on a perfectly harmless business under such circumstances and at such times as meets his own convenience.

In many ways the majority opinion destroys individual freedom in defiance of the guarantees of state and

national constitutional provisions. In order to make my position clear a few basic principles of constitutional law are to be brought to mind. While they are scarcely mentioned in the majority opinion, they bear directly upon the controversy and are in fact more pertinent to the issues than some principles discussed at length therein.

The first principle universally recognized by all appellate courts, is that every citizen has the inherent right to work or not to work when and if he desires so to do; that every citizen has an inherent right to use his real and personal property whenever and wherever he sees fit to do so; and that every citizen has an inherent right to sell and dispose of any property owned by him at any time and for any consideration, unless restrained by the legislature in a proper exercise of the police power. "The legislature has no power, under the guise of police regulations, to arbitrarily invade the personal rights and personal liberty of the individual citizen." *Chenoweth v. State Board of Medical Examiners,* 57 Colo. 74, 141 Pac. 132. See also *Platte, etc. C.&M. Co. v. Dowell,* 17 Colo. 376, 30 Pac. 68.

In *Denver v. Thrailkill,* 125 Colo. 488, 244 P. (2d) 1074, this court stated that the unreasonable act of the legislative body, which was there held to impose an unjustified restraint. was completely "out of harmony with the American constitutional concept of fundamental freedoms and liberties, under which the individual has the right to engage in a lawful business which is harmless in itself and useful to the community, unhampered by unreasonable and arbitrary governmental interference or regulation."

In *Chenoweth v. State Board of Medical Examiners, supra,* we stated:

"The power of the legislature however, is not such as may unreasonably interfere with the undoubted right of every citizen to follow any lawful calling, business, or profession he may choose, subject only to reasonable regulation * * *."

In *Denver v. Thrailkill, supra,* we recognized that every citizen has a "basic right to demand that governmental regulation of business or restraints upon freedoms must be reasonably essential and necessary in the public interest."

In *People v. Norvell*, 13 N.E. (2d) 960, we find this pertinent statement of the principle:

"The privilege of a citizen to use his property according to his will is not only a liberty but a property right, subject only to such restraints as the common welfare may require, and while new burdens may be placed on the property when the public welfare demands it, this power is. limited to enactments *having direct reference to the public health, comfort, safety, morals and welfare."* (Emphasis supplied.)

I am firm in my conviction that no reasonable justification for the restraints of the statute in question can be found when tested by considerations of public health, safety, morals or welfare. Matters occurring in the long period of time devoted by this court to consideration of this cause, establish beyond question that the litigants who urge upon us the legality of this statute are interested in serving a private rather than a public purpose; to force acceptance of the business practices of one group of automobile dealers upon all persons engaged in the business of buying and selling motor vehicles. The restraints imposed by this act do not in any degree whatever concern the public health, morals or welfare, and no attempt is made in the majority opinion to reconcile them to the limitations of the constitution or to point out any reasonable connection therewith in the statute. Among those who appeared as amici curiae none was to be found even remotely pretending to represent the public interest. On the contrary, it was apparent from the briefs submitted by them that the "friends of court" were in fact capable lawyers admittedly representing the private interests which actually are served

by this arbitrary and unreasonable statute, the enforcement of which is sought "under the guise of police regulation."

The term "property" as used in the due process clause of our constitution, includes the right of the citizen to make any legitimate use or disposition of the thing owned, and he cannot be deprived of any of these essential attributes of property unless the restraint is reasonably necessary in the promotion of a *public interest. Delaware et al. v. Mayor, etc.,* 14 Fed. (2d) 257. No *public interest is promoted by this statute;* on the contrary the freedom of half a million adult citizens of this state to buy property when they please is denied, and the freedom of a substantial number of dealers who have declined to permit others to dictate to them as to when they should do business, likewise is denied. I protest against it.

In *Buchanan v. Warley,* 245 U.S. 60, 38 Supreme Court Reporter 16, the Supreme Court of the United States stated:

"Property is more than the mere thing which a person owns. It is elemental that it includes the right to acquire, use, and dispose of it. The Constitution protects these essential attributes of property."

It is well established in the law that whether an act of a legislative body adopted as a police regulation has any reasonable connection with public health, morals, safety or welfare, is a question for the determination of the judiciary. This court has stated that any such regulation "must bear a fair relation" to those objectives and must "tend to promote or protect the same." *Sapero v. State Board of Medical Examiners,* 90 Colo. 568, 11 P. (2d) 555. To hold otherwise would be to examine an act without reference to the constitutional validity thus surrendering the jurisdiction of the courts to legislative findings in constitutional matters.

Actually there is but one question to be determined

in this case, and that is, whether the prohibition of the sale of an automobile on Sunday has any reasonable connection with the public health, safety, morals or welfare. It will not be disputed that the act involved, if sustained at all, must find justification under the police powers. It requires a far more fertile imagination than I possess after thirty-five years experience at the bar and on the bench, to find in this statute any "fair relation" to the public health, safety, morals or welfare, or how the Act can reasonably be said to "tend to promote or protect the same."

On the 4th day of March, 1939, the then Chief Justice of the Supreme Court of the United States, the Honorable Charles Evans Hughes, in a ceremony conducted in the House of Representatives of the United States of America, commemorating the establishment of a government of *free people* said, among other things:

"We protect the fundamental right of minorities, in order to save democratic government from destroying itself by the excesses of its own power. The firmest ground for confidence in the future is that more than ever we realize that, while democracy must have its organization and controls, *its vital breath is individual liberty.*" (Emphasis supplied.)

It is a high duty and responsibility of the judicial branch of government, through the decisions of controversies which come before it, to safeguard and maintain the constitutional provisions which guarantee the maximum freedom of the individual. I view with apprehension and regret the trend of recent times to emasculate these guarantees, to ignore the rights of minorities and to surrender a virtual dictatorship into the hands of those who have power. I respectfully submit that appellate courts should not hesitate to nullify legislation, the only purpose of which is to place yet another unreasonable and unconstitutional restraint upon individual freedom.

The "vital breath" of democracy referred to by Mr. Chief Justice Hughes, is being frittered away; the strength and vitality of the Constitutions of the state and nation in the protection of individual rights is being slowly but surely "nibbled to death." Every opinion of this kind becomes a rung upon the ladder of precedent upholding new and additional restraints upon the freedom of the individual. Our people are now told that activities, which for generations have been considered harmless, suddenly bear a great and "fair relation" to the public health, safety and welfare and must be prohibited. It is time that courts assert their responsibility to reactivate the Constitution while there is sufficient "vital breath" remaining therein to sustain life. The framers of our system of government knew full well that there would be occasions when powerful forces seeking more power would ignore the "fundamental rights of minorities" and, even with the best of intentions from their own point of view, exercise that power in such manner as to destroy freedom. For that reason the judicial branch of government was charged with the responsibility of safeguarding those fundamental rights and of passing upon the reasonableness of such legislative acts as the one before us. Thus under our system, it is the highest honor as well as the solemn duty of the court to protect the citizen in his right to "observe the Sabbath" if he desires to do so, or to decline to "observe the Sabbath" or to assert that the "Sabbath" shall be some day other than Sunday; to "protect the fundamental rights of minorities in order to save democratic government from destroying itself by the excesses of its own power." This is a sacred and weighty responsibility. Its fulfillment cannot be met if we "shirk the duty or fear the peril" involved in protecting the unorganized masses of our citizens from the unreasonable restraints imposed for the benefit of those few who possessing influence and power would, in furtherance of their own interests, impose their will upon the least of us.

Mr. Justice Knauss dissenting:

I respectfully dissent from the conclusion reached by the majority. It will not be denied that House Bill No. 45 of the Fortieth General Assembly, the subject of judicial scrutiny in the instant case, was and is special legislation. By this enactment the General Assembly singled out one segment of business of our state, to the exclusion of all others, a segment which inherently has no more to do with the public peace, health, morals and safety than the sale of "automobile accessories * * * towing or wrecking" which activities are specifically exempted from the provisions of the Act. To me the definition of a "motor vehicle" in Section 1 of the Act is most artificial and clearly discriminatory. Why this definition "a self-propelled vehicle" excluded "farm tractors and other machines and tools used in the production, harvesting and care of farm products" we may only conjecture. The cases which have approved Sunday Closing laws for automobile dealers had no such exception in the definition of a motor vehicle.

Under this exception dealer "A" having a place of business directly across the street from dealer "B" could remain open for business on the Sabbath day because he had for sale farm tractors, trucks, machines and tools used in the production, harvesting and care of farm products. At the same time dealer "A" might have on his premises a dozen or a hundred motor vehicles as defined in the limited language of the 1955 Act. It will not do to say that dealer "A" cannot sell one of his motor vehicles on Sunday, for he is permitted to remain open, attract customers by advertising and otherwise make contacts with the buying public, while dealer "B" (directly across the street) who does not have a farm tractor or dump truck on his lot must remain closed. We would be naive indeed if we believed that trucks and motor vehicles, even under the limited definition of the Act, are not used in the "harvesting and care of farm

products." These may be sold because of their relationship to agriculture throughout the vast farming districts of this state. By the terms of this Act the sale of these machines is not offensive to the peace, morals, health, welfare and safety of the people of this state, but that of a shiny new automobile is. When the General Assembly enacts a statute which includes all engaged in the industry then we may with propriety determine whether we will continue to follow *Rosenbaum v. Denver,* 102 Colo. 530, and the recent pronouncement in *Gundaker Central Motors, Inc. v. Gassert* (N.J.), 127 A. (2d) 566. We "cannot close our eyes to reality" as stated in the majority opinion. I am convinced that the exception in Section 1 of the 1955 enactment renders the act discriminatory and offensive to the provisions of the constitution prohibiting special legislation.

I am satisfied that the case of *Denver v. Schmid* is directly in point. There Denver adopted an ordinance closing barber shops on Sunday and holidays from which prohibition "beauty parlors" were expressly excluded. There this court, speaking through Mr. Justice Burke, said: "That this ordinance is unreasonably arbitrary appears to us self-evident. * * * It does not apply to a particular trade or occupation because it is common knowledge that much of the work of barbershops is also performed in beauty parlors which are expressly excepted." The ordinance there considered was declared void. See, also, *Allen v. Colorado Springs,* 101 Colo. 498, 75 P. (2d) 141; *Mergen v. Denver,* 46 Colo. 385, 104 Pac. 399; *Denver v. Bach,* 26 Colo. 530, 58 Pac. 1089.

Section 25 of Article 5 of the Colorado Constitution prohibits the General Assembly from passing special legislation. "Where a general law can be made applicable, no special law shall be enacted." So declares the fundamental law of this Commonwealth. Why make fish of one dealer in motor vehicles and fowl of another? The Constitution says it cannot be done. The act here considered arbitrarily imposes upon dealers in certain com-

modities disabilities on Sunday, and yet allows others who are in the same general field and business to·be free from such disabilities on the first day of the week. There should be some substantial reason back of the prohibition on one business or avocation and not upon another which to all intents and purposes is the same as the one on which the statute operates. *Denver v. Bach, supra.*

In brief, I am of the opinion that the 1955 Act unduly prefers a dealer in motor vehicles used for one purpose over the identical vehicles used for another purpose. Such being my conclusion, in view of the several decisions in this state to the effect that where a statute, criminal in nature, admits of two constructions, we must adopt the construction most favorable to the person charged with the violation of the law, I feel that the Act is discriminatory, and hence invalid.

When the General Assembly enacts a general closing law with reference to all dealers engaged in this field it will be time to consider the other matters involved in this case. These are some of the reasons why I think the act violative of the fundamentals on which our decisions must be predicated.

MR. JUSTICE SUTTON dissenting:

I respectfully dissent.

The statute in question is invalid. Clearly it discriminates between dealers who sell only motor vehicles and " * * * farm tractors and other machines * * *." The term "machine" by definition can include vehicles (see Webster's Complete Reference Dictionary and Encyclopedia 1945 and *Dorset v. State,* 144 Okla. 33, 289 Pac. 298). This court has held that whether a passenger vehicle used on a farm is a farm wagon and implement exempt from execution is a jury question. *People v. Corder,* 82 Colo. 318, 259 Pac. 509.

The Act also violates Section 1 of the Fourteenth

Amendment to the Constitution of the United States which expressly provides in part that no state shall " * * * deprive any person of life, liberty or property without due process of law" and it forbids any state from denying " * * * to any person within its jurisdiction the equal protection of the laws." It also violates Article V, Section 25 of the Constitution of the State of Colorado which expressly states in part: "The General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say; * * * (none applicable cited). *In all other cases, where a general law can be made applicable, no special law shall be enacted.*" (Emphasis added.)

I would expressly overrule *Rosenbaum v. Denver,* 102 Colo. 530, 81 P. (2d) 760, and all other Colorado decisions of this type which fetter, without constitutional justification, some of our citizens.

Clearly a general law could be enacted requiring a surcease from labor on Sundays which would apply equally to *all* businesses. It could omit with propriety those which in fact sell necessaries and those engaged in charitable works and religious activity. Such a law would apply equally to all our citizens. Properly legislatively defined businesses such as those selling liquor are of course subject to separate restrictions because of their direct effect on the public morals, health, safety and welfare.

This court said in *Denver v. Bach,* 26 Colo. 530, 58 Pac. 1089, that the business (clothing store) which the city was attempting to close on Sundays was not " * * * unlawful; it does not in any manner interfere with morality, or tend to create disorder, nor has the city any special control over it different from that which it may exercise over other avocations of the same general character." The court then went on to point out why that ordinance was unconstitutional and why it violated Article V, section 25 of the Colorado Constitution. That case is in point here and expresses what the law was in

Colorado before this court was led down the primrose path of piecemeal shackling of personal rights. It is high time we got back on the track.

Fundamentally Sunday closing laws when not in conflict with our Constitutions are deemed by many people to be sound and for the general welfare of mankind. It is for the legislature to decide whether it will adopt the precept of Sunday closings. It must not, however, adopt it in violation of guaranteed rights or in any discriminatory manner.

In the barbershop closing case of *McClelland v. Denver*, 36 Colo. 486, 86 Pac. 126, this idea was expressed better than I can when the court said in part:

"The experience of centuries has demonstrated the necessity of periodical cessation from secular labor. This rule of conduct with respect to secular pursuits is recognized by the entire civilized world as essential to the physical and moral welfare of society. Sunday ordinances are, therefore, generally sustained as constitutional upon the theory that for the purpose of promoting the general welfare of the inhabitants of a city it is necessary that their usual and ordinary avocations, except those of necessity or charity, should be suspended upon the Sabbath day, and that for this reason such ordinances are within the domain of the police power of the municipality enacting them."

However, there this court then strayed and began to uphold the piecemeal discrimination between lawful harmless pursuits which has resulted in the instant case.

Neither logically nor legally can I see the difference between selling motor vehicles or tractors, or horses or boats on Sunday. They are all personal property. There is no necessity or reason for any discrimination or classification between them when it comes to the question as to which businesses selling such property may stay open on any given day. Clearly the reasoning of *Denver v. Bach, supra,* applies.

Originally fundamental error was committed by this

and many other courts when their decisions fathered the doctrine of minute class distinction. It does not always follow that a lawful subject for legislation of this type can be broken down into its component parts. This is particularly true where it erodes the fundamental rights of a free citizenry. It seems to me that the principles of law advanced by the majority have been those urged on this court in most of the cases where this tribunal has had the unpleasant but necessary task of declaring a statute unconstitutional.

It is our duty to declare an act unconstitutional when it clearly and beyond reasonable doubt violates the constitution as this one does. *Stare decisis* binds us except when there is a fundamental error of law defeating justice and where no substantial injury will be worked or no great harm will come to vested property rights. (See *People v. Cassidy,* 50 Colo. 503, 117 Pac. 357; *Wolf v. People,* 117 Colo. 279, 187 P. (2d) 926.) "Courts are not bound to perpetuate errors merely upon the ground that a previous erroneous decision has been rendered on a given question. If it is wrong it should not be continued, unless it has been so long the rule of action, and relied upon to such an extent, that greater injustice and injury will result by reversal, though wrong, than to observe and follow it. *Black on Interpretation of Laws,* paragraph 152; *Sutherland's Stat. Const.,* paragraph 316; *Boon v. Bowers,* 30 Miss. 246." *Calhoun Gold Mining Co. v. Ajax Gold Mining Co.,* 27 Colo. 1, 59 Pac. 607. I note that recently the Supreme Court of the United States overruled some sixty years of active precedent because it believed the cases were based upon a mistaken concept. *Brown v. Board of Education,* 347 U.S. 483.