## No. 22486

COLORADO CHIROPRACTIC ASSOCIATION, A COLORADO NON-PROFIT CORPORATION, AND LOUIS O. GEARHART *v.* STATE OF COLORADO AND THE COLORADO STATE DEPARTMENT OF PUBLIC HEALTH.

(467 P.2d 795)

Decided April 6, 1970.

CHARLES GINSBERG, for plaintiffs in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, WILLIAM TUCKER, Assistant, CLIFTON A. FLOWERS, Special Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

Colorado Chiropractic Association, a Colorado nonprofit corporation, and Louis O. Gearhart, a licensed doctor of chiropractic, instituted proceedings in the district court for a declaratory judgment to test the correctness of the

construction of C.R.S. 1963, 66-8-7, by the Colorado State Department of Health (the Department of Health).

The statute in question (66-8-7) provides:

"In case of any death occurring without medical attendance it shall be the duty of the undertaker or other person having knowledge of such death to notify the coroner immediately. The coroner shall notify the district attorney and then shall hold an investigation or inquest and make whatever inquiry he deems proper respecting the cause and manner of death. If either the coroner or the district attorney deems it advisable, the coroner shall cause a post mortem examination to be made, by a licensed physician, on the body of the deceased to determine the cause of death. Any certificate of death made by a coroner shall be filed with the registrar and shall state his findings concerning the nature of the disease or the manner of death and, if from external causes, the certificate shall state whether in his opinion death was accidental, suicidal, or felonious. The coroner shall furnish such additional information as may be required by the state registrar."

The Department of Health construed the statute to mean that where one dies while under the care of a chiropractor it is a "death occurring without medical attendance." The trial court, in its judgment, adopted this construction.

In their complaint the plaintiffs asked (1) that the statute be so construed that a patient whose death occurs while attended by a chiropractor be deemed to have died *with* "medical attendance"; or, in the alternative, (2) that the statute be declared unconstitutional.

The constitutional issue is based on the allegation that the statute

"* * * is arbitrary, unnecessary and unreasonable, inflicting unnecessary and unreasonable restrictions upon the chiropractic profession, and is not in the interest of the public generally, is not beneficial to the public health, morals and safety, and does not promote the public wel-

fare, and is unduly oppressive on individual citizens who are licensed chiropractors."

The issues as drawn require us to determine (1) whether a chiropractor may sign a death certificate; and (2), if we answer (1) in the negative, whether the statute in question is unconstitutional when tested by the *equal protection* and *due process* provisions of the state and federal constitutions. Colo. Const. art. 2, § 25; Colo. Const. art. 5, § 25; U.S. Const. amend. XIV, § 1.

To gain an overview of the problems requires an examination of the several statutory provisions relating to *chiropractors* (ch. 23), *physicians* (ch. 91), and *death certificates* (ch. 66).

*C.R.S. 1963, 66-8-6(1)(a).* "The certificate of death shall contain the following items:

\* \* \*

"(q) Statement of medical attendance on decedent, fact and time of death, including the time last seen alive.

"(r) Cause of death, including the primary and immediate causes, and contributory causes or complications, if any, and duration of each.

"(s) Signature and address of *physician* or official making the medical certificate.

\* \* \*

"(2) The personal and statistical particulars in subsections (1)(b) to (1)(n) of this section shall be authenticated by the signature of the informant, who may be any competent person acquainted with the facts.

\* \* \*

"(4) The medical certificate shall be made and signed by the *physician,* if any, last in attendance on the deceased, who shall specify the time in attendance, the time he last saw deceased alive, and the hour of the day at which death occurred. He shall state the cause of death, so as to show the course of disease or sequence of causes resulting in death, giving the primary and immediate causes, and also the contributory causes, if any, and the duration of each. Indefinite and unsatisfactory returns,

indicating only symptoms of disease or conditions resulting from disease, will not be held sufficient for issuing a burial or removal permit; any certificate containing only such terms as defined by the state registrar shall be returned to the *physician* for correction and definition. Causes of death, which may be the result of either disease or violence, shall be carefully defined; and, if from violence, its nature shall be stated, and whether probably accidental, suicidal, or homicidal. * * *" (Emphasis added.)

Chapter 91, article 1, C.R.S. 1963, known as the "Medical Practice Act," must be considered because it represents the basic law on the healing arts. C.R.S. 1963, 91-1-6 defines the term "practice of medicine." "Practice of medicine" is the closest term to "medical attendance" to be found in the chapters relating to the healing arts.

Under 91-1-6(1) (a), "practice of medicine" means, among other things,

"(b) Holding out one's self to the public within this state as being able to diagnose, treat, prescribe for, palliate or prevent any human disease, ailment, pain, injury, deformity, or physical or mental condition, whether by the use of drugs, surgery, manipulation, electricity, or any physical, mechanical or other means whatsoever;

"(c) Suggesting, recommending, prescribing or administering any form of treatment, operation or healing for the intended palliation, relief, or cure of any physical or mental disease, ailment, injury, condition or defect of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift or compensation whatsoever;

\* \* \*

"(e) Using the title M.D., D.O., doctor, surgeon, or any word or abbreviation to indicate or induce others to believe that one is engaged in the diagnosis or treatment of persons afflicted with disease, injury or defect of body or mind, except as otherwise expressly permitted by the laws of this state now or hereafter enacted relating

to the practice of any limited field of the healing arts;
* * *."

However, an exception to the practice of medicine, as
defined, is made for the practice of chiropractic, as well
as other limited fields of the healing arts, under con-
ditions and limitations specifically defined in the statutes.

The general assembly makes clear its intention to re-
strict the practice of those licensed to practice in a
limited field of the healing arts in 91-1-6(3)(n). It pro-
vides that such licentiates,

"* * * shall confine themselves strictly to the field for
which they are licensed and to the scope of their re-
spective licenses, * * *."

The plaintiffs in error argue that because a chiro-
practor, just as a doctor of medicine or a doctor of
osteopathy, since 1937 has been required to have a "cer-
tificate of ability in anatomy, physiology, chemistry,
bacteriology, and pathology" before he is permitted to
take an examination for a license to practice chiropractic,
he should be treated the same as doctors of medicine and
doctors of osteopathy under the law, so far as supplying
the medical history of his deceased patients in the death
certificate is concerned.

The courses of study of the several limited
branches of the healing arts are not determinative of
the scope of practice permitted under any given license.
The law provides that (C.R.S. 1963, 23-1-1[2]):

"It shall be unlawful for any person to practice or to
offer to practice chiropractic in the state of Colorado,
as defined in this article, * * * unless * * * duly licensed
* * *, and anyone who holds himself out to the public
as a doctor of chiropractic without qualifying for proper
licensing under this article and without submitting to the
regulations provided in this article, endangers thereby
the public life, health, property, and welfare."

"Chiropractic" is defined in 23-1-2(1)

"* * * as that branch of the healing arts which is based
on the premise that disease is attributable to the ab-

normal functioning of the human nervous system. It includes the diagnosing and analyzing of human ailments and seeks the elimination of the abnormal functioning of the human nervous system by the adjustment or manipulation, by hand, of the articulations and adjacent tissue of the human body, particularly the spinal column, and the usage as indicated of procedures which facilitate and made the adjustment or manipulation more effective, and the use of sanitary, hygenic, nutritional and physical remedial measures necessary to such practice."

Further evidence of the limited scope of the practice of chiropractic is found in C.R.S. 1963, 23-1-18, relating to the use of the title "Doctor of Chiropractic" or the letters "D.C." This section, in part, provides that

"* * * Such license shall not confer upon the licensee the right to practice surgery, obstetrics, or to prescribe, compound or administer drugs, or to administer anaesthetics. * * *"

In order to resolve the first question favorably to the plaintiffs in error, we must decide first that, under 66-8-6(4), a chiropractor is a "physician," and, secondly, that by the terms of his license he is qualified to "state the cause of death, so as to show the course of disease or sequence of causes resulting in death, giving the primary and immediate causes, and also the contributory causes, if any," particularly if the cause or causes are not solely related "to the abnormal functioning of the human nervous system."

■ An examination of many sections relating to the healing arts leads us to the inescapable conclusion that the term "physician" relates solely to doctors of medicine and doctors of osteopathy. *State v. Fahey,* 152 Minn. 220, 188 N.W. 260. The word "physician" does not appear in C.R.S. 1963, Chapter 23, the Chiropractic licensing act.

■ The requirements of 66-8-6(4) are such that it is equally inescapable that one circumscribed in his practice to diseases involving the functioning of the nervous system is not legally qualified, regardless of educational

qualifications, to make the examinations and judgments necessarily required to be able to complete the death certificate. *State v. Fahey, supra.*

■ The remaining question is whether the limitation denies chiropractors "equal protection" or "due process." The presumption of constitutionality places the burden on the attackers to show its unconstitutionality beyond a reasonable doubt. *People v. McKenzie,* 169 Colo. 521, 458 P.2d 232; *Mosko v. Dunbar,* 135 Colo. 172, 309 P.2d 581; *Gettman v. Board of Commissioners,* 122 Colo. 185, 221 P.2d 363.

■ The fact, if such it be, that it is "embarrassing" to chiropractors not to be able to furnish the information required in the death certificate does not *per se* constitute discrimination of constitutional magnitude. Doctors of medicine, doctors of osteopathy, chiropodists, dentists, and doctors of chiropractic all practice their professions by grace of the state. The scope of their practices is limited by law. Where the limitation of authority to one class of licensee results from a basic difference in the scope of its authorized practice, it connot be said that the legislature has acted arbitrarily. *Howe v. Smith,* 203 Pa. Super. 212, 199 A.2d 521. It is only when the classification is not founded on real and substantial distinctions that it becomes unconstitutional.

The judgment is affirmed.

MR. JUSTICE DAY dissents.

MR. JUSTICE DAY dissenting:

I dissent.

The majority states that the scope of the practice of a member of the healing professions — listing among them chiropractors — is limited by law. I agree. But we have under consideration in this case not a legislative prohibition against chiropractors signing death certificates but

a rule and regulation of the Board of Health which extends, in my opinion, far beyond the Board's power. That the rule does exclude a class of persons qualified to evaluate the information for purposes of vital statistics may easily be demonstrated by the legislative acts quoted in the majority opinion.

For example, C.R.S. 1963, 66-8-5, states, *inter alia:* "Midwives shall not sign certificates of death * * *." That's plain language! The legislature used no such prohibitive language against chiropractors in any of its enactments. In the absence of such plain prohibition I find no disqualifying legislation. The chiropractor is required to take the examination provided for in C.R.S. 1963, 91-5-1, *et seq.* In that act those engaged in the healing arts — which everyone agrees includes the practice of chiropractic — are deemed to be those persons practicing *"any system* for the treatment, operation, *diagnosis,* prescription or practice for the prevention, *ascertainment, cure, relief,* palliation, *adjustment or correction of any human disease, ailment, deformity, injury or unhealthy or abnormal physical or mental condition."* (Emphasis added.) C.R.S. 1963, 91-5-3.

I think the scope of the qualifications which are required to be demonstrated to be able to practice in the field is the true test. For example, there are medical practitioners who have limited the scope of their practice, perhaps only to the eyes or ears, and have been so engaged for years. Yet who would say that they could not sign a death certificate in view of the basic qualifications required on their admission to practice.

In other legislation, C.R.S. 1963, 23-1-2(1), defines chiropractic as *including the diagnosing and analyzing of human ailments.* Therefore, anyone holding a certificate from the State of Colorado which declares to the public that he is qualified to and capable of *diagnosing and analyzing human ailments* can give the information required in C.R.S. 1963, 66-8-6(1)(r) — "Cause of death, including the primary and immediate causes, and con-

tributory causes or complications, if any, and duration of each."

C.R.S. 1963, 66-8-7, which is the section the State Board of Health has attempted to interpret by its rules and regulations was first enacted in 1907 and amended in 1957. The new act providing for the licensing of those engaging in the practice of chiropractic in Colorado was passed in 1959. It is my considered judgment that this act, enacted after the amendment of 66-8-7, declaring a chiropractor *qualified to diagnose and analyze human ailments* hardly comports with an interpretation of "non-medical attendance."

It is axiomatic that the laws dealing in similar matters so varied and complex as the voluminous Public Health Act and the statutes regulating the licensing of professions should be read in *pari materia* to avoid legislative conflict. There is no inherent power in the Department of Health to promulgate rules and regulations which nullify the license which the legislature has granted to the class of persons attempted to be excluded here.

Additionally, it should be considered that C.R.S. 1963, 68-8-6 (t) provides for "Special information concerning deaths in hospitals and institutions * * *." This court can take judicial notice of the fact that there is in Denver a chiropractic *hospital* functioning and duly licensed by the State Department of Health under the powers conferred in C.R.S. 1963, 66-4-1, *et seq.* The same Department of Health which has promulgated the rule and regulation here under attack in that case many years ago attempted to deny a license to operate to that particular hospital. This court said in *Spears Free Clinic and Hospital v. State Board of Health,* 122 Colo. 147, 220 P.2d 872, that the department was without statutory authority to deny to the institution the right to open and operate as a hospital. Since no medical doctor practices in that hospital, it is difficult to see how the information required of that particular hospital could be complied with if those

in attendance are not permitted to fill out and sign the certificate requiring that information.

Additionally, the rule and regulation of the State Board of Health is incongruous when one takes cognizance of the fact that the coroner who is to be summoned in the event of "death without medical attendance" is usually an undertaker, and in some instances a layman elected in the partisan county election. If an undertaker or lay-coroner is qualified to make out a death certificate, then it does not make sense to say that one who is required to demonstrate the qualifications demanded of a chiropractor cannot certify to such information.

I would hold the Health Board rule to be in conflict with the license granted to chiropractors under C.R.S. 1963, 23-1-2(1), *et seq.* and therefore void.